In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-2523

BRIAN HOPE, *et al.*,

*Plaintiffs-Appellees*,

*v.*

COMMISSIONER OF INDIANA DEPARTMENT OF CORRECTION, *et al.*,

*Defendants-Appellants*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:16-cv-2865 — **Richard L. Young**, *Judge*.

ARGUED MAY 20, 2021 — DECIDED AUGUST 16, 2021

Before SYKES, *Chief Judge*, and EASTERBROOK, KANNE, ROVNER, WOOD, HAMILTON, BRENNAN, SCUDDER, ST. EVE, and KIRSCH, *Circuit Judges*.[1]

---

[1] Circuit Judge Jackson-Akiwumi did not participate in the consideration or decision of this case.

ST. EVE, *Circuit Judge*. Indiana's Sex Offender Registration Act ("SORA") imposes registration requirements and restrictions on sex offenders who reside, work, or study in the State. Ind. Code § 11-8-8-1 *et seq*. By virtue of the State supreme court's construction of the Indiana Constitution, Indiana's Ex Post Facto Clause prohibits retroactive application of SORA to offenders convicted before its enactment unless the marginal effects of doing so would not be punitive. *Wallace v. State*, 905 N.E.2d 371 (Ind. 2009); *Jensen v. State*, 905 N.E.2d 384 (Ind. 2009). If an offender was under no registration requirement prior to SORA's passage, imposing a registration requirement in the first instance is impermissibly punitive. *Wallace*, 905 N.E.2d at 371. The Indiana Supreme Court has held, however, that if another state previously subjected a pre-SORA offender to a registration requirement, requiring him to register in Indiana is not punitive. *See, e.g.*, *Tyson v. State*, 51 N.E.3d 88 (Ind. 2016). Indiana caselaw thus has the peculiar effect of permitting the State to treat similarly situated offenders differently based solely on whether an offender had an out-of-state registration obligation. That feature underlies the present appeal.

The plaintiffs, six sex offenders residing in Indiana, were convicted prior to SORA's passage. Each of them had to register in another state. After moving to Indiana, the State required them to register under SORA. Absent their out-of-state registration obligations, Indiana's Constitution would prohibit SORA's application to them. Plaintiffs challenge the constitutionality of SORA on three fronts, arguing that it violates their right to travel under the Privileges or Immunities Clause, their right to equal protection under the Fourteenth Amendment, and Article I's prohibition on ex post facto laws. The district court granted summary judgment for the

plaintiffs on all claims, and Indiana appealed. A divided panel of this Court affirmed the district court, but we subsequently agreed to hear the case en banc.

We now reverse. SORA does not violate the right to travel because it does not expressly discriminate based on residency, as consistently required by the Supreme Court. Plaintiffs' ex post facto claim is likewise precluded by precedent. Applying *Smith v. Doe*, 538 U.S. 84 (2003), we hold that SORA is not "so punitive either in purpose or effect" as to surmount Indiana's nonpunitive intent for the law. But because the district court did not address whether SORA passes rational basis scrutiny under an equal protection analysis, we remand for consideration of the equal protection claim.

## I.

### A.

The Indiana General Assembly enacted SORA, also known as "Zachary's Law," in 1994. SORA establishes both requirements and restrictions for qualifying sex offenders, and it authorizes the Indiana Department of Correction ("IDOC") to collect and publish data about them. Ind. Code § 11-8-2-13(b). Under SORA, offenders must register by reporting to local law enforcement at least once annually in every county where they reside, work, or study. §§ 11-8-8-14, 11-8-8-7. Reporting requirements are more frequent for "sexually violent predators"—every 90 days—and offenders without permanent housing—every 7 days. §§ 11-8-8-14, 11-8-8-12. Registration entails providing detailed personal information, including: a photograph; legal name, date of birth, and physiological features; identification numbers; internet usernames and email addresses; residential, school, and

workplace addresses; vehicle information and license plate number; and any "other information required by the [IDOC]." § 11-8-8-8(a). Offenders must report any change to this information within 72 hours. SORA also mandates that law enforcement officers contact offenders once a year to verify their residences (every 90 days for sexually violent offenders). § 11-8-8-13(a). And offenders pay a yearly $50 registration fee, plus a $5 fee any time they must register a change of address. § 36-2-13-5.6.

Certain offenders are subject to more stringent requirements. A "sexually violent predator" must notify law enforcement if he plans to be absent from his residence for more than 72 hours and must register in the county that he visits. § 11-8-8-18. An "offender against children" may not work or volunteer at a school, daycare, youth program center, or public park and cannot live within 1,000 feet of these locations. §§ 35-42-4-10(c), 35-42-4-11. A "serious sex offender" may not enter school property. § 35-42-4-14. An offender's failure to comply with SORA can result in criminal sanctions.

Following its enactment, SORA underwent several expansions. Indiana broadened the list of crimes that trigger registration requirements, and it amended SORA to require registration for individuals convicted of substantially similar offenses in another state. On July 1, 2006, the General Assembly extended SORA's requirements to any "person who is required to register as a sex offender in any jurisdiction." § 11-8-8-5(b)(1). In its current form, SORA requires offenders to register if they were:

(1) convicted of an enumerated Indiana criminal offense, §§ 11-8-8-4.5, 11-8-8-5(a);

(2) convicted of a "substantially similar" offense in an-
other jurisdiction, § 1-1-2-4(b)(3); or

(3) required to register by another state (the "other-juris-
diction provision"), § 11-8-8-5(b)(1).

By its plain terms, SORA covers any offender who fits within
these categories—regardless of his date of conviction.

**B.**

While SORA is fully retrospective as a statutory matter,
the Indiana Constitution constrains its applicability to offend-
ers with pre-SORA offenses. The Indiana Supreme Court ar-
ticulated these constitutional boundaries in a series of deci-
sions, beginning with *Wallace v. State*. In *Wallace*, the court ap-
plied its own version of the Supreme Court's "intent-effects"
test and held that SORA had a punitive effect as applied to
Wallace—who had been charged, convicted, and served his
sentence before Indiana enacted SORA—and that it thus vio-
lated Indiana's Ex Post Facto Clause. 905 N.E.2d at 379, 384.

*Wallace* did not foreclose all retroactive applications of
SORA, however. Indeed, the same day that it decided *Wallace*,
the Indiana Supreme Court issued its opinion in *Jensen v.
State*. Unlike Wallace, Jensen pleaded guilty in 2000—after
SORA's enactment. 905 N.E.2d at 388. At the time of his con-
viction, SORA required that he register as a sex offender for
ten years. *Id.* at 389. Before the expiration of Jensen's ten-year
registration requirement, the Indiana General Assembly
amended SORA in 2006 to mandate that offenders like him
register for life. He argued that this extension as applied to
him violated Indiana's Ex Post Facto Clause, but the Indiana
Supreme Court disagreed. In contrast to Wallace, who had no
obligations before the legislature amended SORA to cover

him, the "'broad and sweeping' disclosure requirements were in place and applied to Jensen at the time of his guilty plea in January 2000. Nothing in that regard was changed by the 2006 amendments." *Id.* at 394. Increasing only the length of an *existing* registration obligation did not rise to the level of "punishment" such that it violated the Indiana Constitution. *Id.* at 391–93.

After *Jensen*, the Indiana Supreme Court continued to focus on the marginal effects of SORA and its amendments. In *State v. Pollard*, 908 N.E.2d 1145 (Ind. 2009), it said that retroactively applying a new residency restriction was "adding punishment." *Id.* at 1154. The court's decision in *Lemmon v. Harris*, 949 N.E.2d 803 (Ind. 2011), though, concluded that an amendment that reclassified someone from a sex offender to a "sexually violent predator" was not punitive because, just like for Jensen, it amounted only to an extension of pre-existing obligations and was not "any more punitive." *Id.* at 810–11, 813 n.19.

Up to this point, each case had asked whether SORA had a marginal punitive effect compared to those requirements already imposed by *Indiana* law. A trio of 2016 cases fleshed out the retroactive applicability of SORA to offenders whose initial registration requirements originated in other states. In *Tyson v. State*, the court upheld the registration requirement for an offender obligated to register under Texas law at the time of his conviction. 51 N.E.3d at 90. It did so even though his conviction and Texas registration obligation occurred before Indiana's SORA covered his offense. *Id.* In reaching this result, the court concluded that the effect of "maintaining a registry requirement across state lines does not amount to a punitive burden" in violation of the state constitution. *Id.*

The court extended this reasoning in *State v. Zerbe*, 50 N.E.3d 368 (Ind. 2016). Zerbe was convicted in Michigan in 1992, before either Michigan or Indiana had enacted sex offender registration laws. *Id.* at 369. Michigan nevertheless required Zerbe to register upon his release from prison because Michigan did not share Indiana's stricter Ex Post Facto Clause and applied its law retroactively. *Id.* at 371. This twist changed nothing: the effect of maintaining that registration in Indiana was not punitive. *Id.* at 370–71. As the court clarified, "it is not Zerbe's *crime* that triggers his obligation to register as a sex offender in Indiana; rather, it is his *Michigan registry requirement* that does so." *Id.* at 370. The trilogy concluded with *Ammons v. State*, 50 N.E.3d 143 (Ind. 2016) (per curiam). Ammons had been convicted in Indiana before the passage of SORA, but he moved to Iowa, which obligated him to register for his Indiana crime. *Id.* When he moved back to Indiana in 2013, the Indiana Supreme Court confirmed that, just like for Tyson and Zerbe, maintaining Ammon's Iowa registration requirement for his Indiana crime did not amount to "additional punishment." *Id.* at 145.

To summarize, the question under Indiana's Ex Post Facto Clause is whether SORA's marginal effect is punitive. Maintaining, extending, or modifying a duty under SORA generally is not punitive, but imposing a new duty is. It is immaterial to the analysis whether Indiana law is maintaining, extending, or modifying its own duties or those of another state. Likewise, it is irrelevant where or when the conviction occurred, as long as another state imposed a lawful registration obligation on the offender and SORA does not so significantly alter that obligation to result in added punishment.

## C.

Plaintiffs Brian Hope, Gary Snider, Joseph Standish, Adam Bash, Patrick Rice, and Scott Rush are sex offenders whose convictions predate the enactment of SORA. With the exception of Hope, each plaintiff's conviction occurred in another state, and all the plaintiffs had to register pursuant to the sex offender registration laws of another state. Upon moving or returning to Indiana, the State required the plaintiffs to register as sex offenders. The circumstances leading to the plaintiffs' registration obligations under SORA fall into the same factual patterns addressed by the Indiana Supreme Court in *Zerbe* and *Ammons*.

Hope was charged with child molestation in Indiana in 1993, prior to SORA's passage, and pleaded guilty. He then moved to Texas, which required him to register under its law. As in *Ammons*, Indiana applied SORA's requirements to him upon his return to the State in 2013. Snider, Standish, Bash, Rice, and Rush mirror *Zerbe*.[2] Each had to register in another state under its retroactive sex offender registration law and

___

[2] Bash's and Snider's cases differ from the earlier Indiana cases in one significant respect: both moved to Indiana before the 2006 enactment of the other-jurisdiction provision. In all three of the Indiana cases upholding the retroactive application of SORA to offenders with out-of-state registration requirements, the plaintiffs had moved to Indiana after July 1, 2006. There thus was no question whether Indiana's Constitution permits retroactive application of the other-jurisdiction provision. This wrinkle does not affect the remaining plaintiffs, who moved to Indiana after 2006. And we ultimately find it nondeterminative in Bash's and Snider's cases. On its face, the provision applies retroactively, and nothing in Indiana Supreme Court caselaw suggests that the state constitution would forbid this.

later moved to Indiana, where Indiana required them to register under SORA.[3]

The plaintiffs filed this suit alleging that as applied to them, SORA violates their right to travel and equal protection and that it runs afoul of the federal prohibition on ex post facto laws.[4] The plaintiffs articulated the burdens that SORA places on them in detail. Each of them is subject to SORA's more onerous reporting requirements and living and working restrictions given the nature of their offenses.[5] SORA classifies all the plaintiffs as "offender[s] against children" and as "serious sex offender[s]"; four of them also qualify as "sexually violent predator[s]." For Snider, Standish, Rush, and Bash (who has full custody of his minor son), this means that they cannot attend school functions or parent-teacher conferences for their children or grandchildren or drive them to school. Hope, who lacks a residence, has been required to leave a

---

[3] There has been some disagreement throughout this litigation regarding whether Indiana required the plaintiffs to register pursuant to the other-jurisdiction provision or because they committed registrable offenses under SORA (or substantially similar offenses under the law of another state). Regardless, the State's view of SORA when enforcing it is not pertinent to our understanding of the law and the state constitutional limits on it. We determine that SORA obligated each of the plaintiffs to register under the other-jurisdiction provision alone.

[4] The plaintiffs originally filed two lawsuits, which the district court consolidated.

[5] Hope pleaded guilty to child molestation, and Standish pleaded no contest to attempted sexual contact with a child under 13. Rush was convicted of sexual battery of a child under 12 years old. Snider was convicted of criminal sexual conduct in the first degree (rape), and Rice was convicted of aggravated rape. Bash pleaded guilty but mentally ill to rape and sodomy.

homeless shelter because it was located within 800 feet of a park. Snider had to move from the home he shared with his wife in 2006 because it fell within 1,000 feet of a daycare. Rush must take a day off work every time he reports. Bash, who relies on government financial assistance, has at times been unable to afford SORA's annual registration fee and been placed on a payment plan.

The district court granted summary judgment to the plaintiffs on all claims and enjoined Indiana from requiring them to register.[6] On appeal, a divided panel of this Court affirmed the district court's summary judgment determination based on the right to travel claim. *Hope v. Comm'r of Ind. Dep't of Corr.*, 984 F.3d 532 (7th Cir. 2021). It did not reach the equal protection or ex post facto claims. We then granted Indiana's petition for rehearing en banc and vacated the panel opinion.

We review the district court's summary judgment determination de novo, drawing all reasonable inferences in favor of the nonmovant. *Peerless Network, Inc. v. MCI Commc'n Serv., Inc.*, 917 F.3d 538, 545 (7th Cir. 2019). Upon review, we reverse and remand.

## II.

### A.

The plaintiffs argue that SORA violates their right to travel by treating them differently based on their length of residency in Indiana. We disagree. SORA may affect newer residents disproportionately, but it does not discriminate based on

---

[6] The plaintiffs sued multiple parties, including IDOC and several county prosecutors and sheriffs in their official capacities. We reference the defendants collectively as "Indiana" or "the State."

residency. Consequently, it does not violate the right to travel as the Supreme Court has articulated it.

The Supreme Court has identified three components of the right to travel: (1) "the right of a citizen of one State to enter and to leave another State," (2) "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State," and (3) "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz v. Roe*, 526 U.S. 489, 500 (1999). Only the third right is at issue here.

That right has evolved over time. Although it is constitutionally safeguarded, there is no mention of a right to travel in the text of the Constitution. As early as 1872, however, the Supreme Court recognized this right as protected by the Constitution and has articulated its contours through subsequent cases. *Id.* at 503 (tracing the right's constitutional pedigree). Throughout that caselaw development, the source of the right to travel has shifted. In many of its earlier decisions, the Supreme Court discussed the right in equal protection parlance. *See, e.g.*, *Zobel v. Williams*, 457 U.S. 55, 60 n.6 (1982) ("Right to travel cases have examined, in equal protection terms, state distinctions between newcomers and longer term residents."). But in its most recent right to travel case, *Saenz v. Roe*, the Court underscored that the right is grounded in the Privileges or Immunities Clause of the Fourteenth Amendment.[7] U.S. Const. amend. XIV, § 1; *Saenz*, 526 U.S. at 502–03.

---

[7] The Court has traced the three components of the right to travel to different parts of the Constitution. It is the third component—the right of new residents and longer-term residents to be treated alike—that is

In *Saenz*, the plaintiffs challenged the constitutionality of a California statute that limited new residents of one year or less to only the welfare benefits to which they would have been entitled in their prior state of residence. 526 U.S. at 492. The Supreme Court held that this rule violated the third aspect of the right to travel. The Court was not concerned with whether California was trying to penalize or deter travel or even if it was succeeding. *Id.* at 504. Instead, the Court found that "the right to travel embraces the citizen's right to be treated equally in her new State of residence" and that "the discriminatory classification is itself a penalty." *Id.* at 505. In addressing this discrimination, the Court applied strict scrutiny, which California's law failed.[8] *Id.* at 504–05. The duration of a citizen's residency and the location of his or her prior residence had no relevance to the citizen's welfare needs, and the bare desire to reduce the state's budget was not compelling enough to justify a complex layered hierarchy among bona fide California residents. *Id.* at 507.

*Saenz* solidified that laws infringing the right to travel must pass strict scrutiny. *See id.* at 504. The full scope of the right, however, remains uncertain. There have been no Supreme Court decisions interpreting the third component of the right to travel since *Saenz*. Cases before it held other durational-residency requirements unlawful but did so under the

---

covered by the Fourteenth Amendment Privileges or Immunities Clause. *Saenz*, 526 U.S. at 502–03. The second component is protected by Article IV. *Id.* at 501. The Court has found support for the first component in various clauses but has not spoken definitively on it. *Id.*

[8] Like the question of the right to travel's constitutional footing, opinions discussing the appropriate scrutiny for the right have arrived at different answers. After *Saenz*, however, we apply strict scrutiny.

Equal Protection Clause. *See, e.g.*, *Mem'l Hosp. v. Maricopa County*, 415 U.S. 250, 251, 261–62 (1974) (striking down a state law requiring an indigent person to be a county resident for one year to receive free medical care); *Dunn v. Blumstein*, 405 U.S. 330, 334–35, 360 (1972) (holding unlawful a state law permitting only residents who have lived in state for one year to vote); *Shapiro v. Thompson*, 394 U.S. 618, 622 (1969) (invalidating statutes that deny welfare assistance to individuals during their first year of residency). *But see Sosna v. Iowa*, 419 U.S. 393, 396, 409 (1975) (upholding an Iowa law requiring a resident to live in state for one year to obtain a divorce decree).

We agree with the plaintiffs, however, that the right to travel should be understood to go beyond prohibiting only durational-residency requirements that place a waiting period on benefits. It seems unlikely that a permanent distinction between bona fide residents based on their time residing in a state would be any more lawful than a temporary one. The Supreme Court's cases illustrate this point, although a majority of the Court has yet to endorse it. In *Zobel*, Alaska implemented a natural resource dividend statute that created "fixed, permanent distinctions between an ever-increasing number of perpetual classes of concededly bona fide residents, based on how long they have been in the State." 457 U.S. at 59. The Supreme Court held that this scheme was improper even under rational basis review. *Id.* at 64. The Court did the same thing with a New Mexico tax exemption for Vietnam veterans who were state residents before a specific date. *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612 (1985).

Although the Supreme Court did not directly hold that the laws at issue in *Zobel* and *Hooper* implicated the right to travel, a plurality of the Court later concluded that the right drove

those decisions. *See Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 907–08 (1986) (plurality opinion). In the plurality's view, "a permanent deprivation of a significant benefit, based only on the fact of nonresidence at a past point in time, clearly operates to penalize appellees for exercising their right to migrate" and thus mandated strict scrutiny. *Id.* at 909.

At bottom, the Supreme Court's decisions in this area share a defining feature: each involved a rule that explicitly discriminated between old and new residents. As the Court noted in *Saenz*, the challenged classifications were "defined *entirely* by (a) the period of residency in California and (b) the location of the prior residences of the [plaintiffs]." 526 U.S. at 505. Likewise, in *Soto-Lopez*, the plurality emphasized that New York had deprived the plaintiffs "of a significant benefit, based *only* on the fact of nonresidence at a past point in time." 476 U.S. at 909. In each case, there has been a direct causal connection between a person's status as a new resident and the deprivation of a benefit. In legal parlance, each involved a "disparate treatment" claim.

**B.**

The critical inquiry in this case is whether Indiana's registration requirement, as applied consistently with the Indiana Supreme Court's marginal-effects test, violates the right to travel as it has been identified by the Supreme Court. Put another way, we ask whether SORA treats bona fide residents differently based on when they become residents. It does not.

Neither SORA nor Indiana's Ex Post Facto Clause discriminates based on residency. As a statutory matter, SORA obligates all offenders—both old and new residents—to register based on prior convictions. Indiana's Ex Post Facto Clause

then relieves a subset of those who must register from that statutory obligation. Receiving the clause's benefits, though, does not depend on when an offender became an Indiana resident but on whether one is subject to an existing registration requirement. That requirement can come from Indiana, *Jensen*, 905 N.E.2d at 391–93, or from another state, *Tyson*, 51 N.E.3d at 90. The twist in this case is that for those offenders like the plaintiffs, convicted before Indiana's SORA covered their crimes, such a registration obligation must come from elsewhere.

The dissent takes issue with this feature of SORA but concedes that unlike *Saenz* and its predecessors, SORA has neither a durational-residency requirement nor a true, fixed-point residency scheme. That distinction is fatal to the plaintiffs' claim. Right to travel violations under the third component of the right exist only when a law expressly differentiates between residents based on their length or timing of residency. SORA does neither.

Instead, the dissent notes that SORA "does take notice of an individual's treatment in another jurisdiction" and argues that it thus "necessarily implicates his travel history." While true, that does not constitute a violation of the right to travel. The third component of the right—which the parties agree is the only aspect at issue in this appeal—deals only with discrimination based on residency. It is not triggered by every law that tangentially relates to a person's travel to or from another state.

In the absence of a true durational-residency requirement or any discriminatory purpose, the plaintiffs look to the effect of SORA on newer residents. As a practical effect of Indiana's SORA, the plaintiffs argue, out-of-state residency is a

determinative factor for them and similar offenders. Un-doubtedly having a registration obligation in another state is correlated with changing one's state of residence, as we can see not only from the six plaintiffs here but also from those in *Tyson*, *Zerbe*, and *Ammons*, all of whom had to register after moving to Indiana. But the correlation is imperfect. Some life-long Indiana residents who committed crimes before SORA might well have a registration obligation based on their employment or schooling in an adjacent state. *See, e.g.*, 730 ILCS 150/3(a-5) (requiring out-of-state students or employees to register in Illinois). The inverse is also true: some new Indiana residents who committed their crimes elsewhere might have no registration requirement in their prior state because of state-law protection against retroactivity. *See, e.g.*, *Doe v. State*, 189 P.3d 999, 1004 (Alaska 2008) (holding that the state's Ex Post Facto Clause prohibits retroactive application of SORA). While prior, out-of-state residency is often an element in the application of SORA's registration requirements, residency is not the trigger for the other-jurisdiction provision.

The dissent acknowledges this but suggests that the law may still be unconstitutional even though some new residents are not adversely affected by SORA's requirements. For support, the dissent looks to *Saenz*. There, the Supreme Court struck down the law, even though some of the new residents received welfare benefits on equal footing as long-term Californians. *Saenz*, 526 U.S. at 497. What mattered, the Court concluded, was that California explicitly based its provision of benefits to new Californians—favorable or not—on the duration of their residence in California. *Id.* at 497, 505. The upshot of the dissent's *Saenz* analogy is that SORA likewise cannot be saved by the fact that some new Hoosiers may not be subject to the registration requirements while some lifelong Hoosiers

may be covered. That is a false equivalence. California employed an express, durational-residency classification; it applied to all persons who had resided in California for less than a year and happened to produce a favorable effect for some of them. In contrast, as the dissent admits, SORA by its terms does not base its application on any length of residency in Indiana. New Indiana residents who arrive in Indiana without any prior registration requirements do not experience a favorable effect under SORA—the law simply does not apply to them at all. In sum, *Saenz* involved a discriminatory test that some new residents passed, while SORA involves a nondiscriminatory test that some new residents fail.

Prior, out-of-state residency represents neither causation nor perfect correlation for the application of SORA's registration requirements, and there is no evidence that anyone in Indiana intended to deter travel through the other-jurisdiction provision. The result? Only a disparate-impact claim remains—an argument that, as a practical matter, more new residents than old residents must register under the law. The difficulty with that approach, though, is that the Supreme Court has never extended the right to travel this far. *Cf. Washington v. Davis*, 426 U.S. 229, 239 (1976) (holding that only disparate treatment or discriminatory purpose violates the Equal Protection Clause). To the contrary, every Supreme Court case involving a violation of the right to travel has featured a law that expressly imposes either a durational-residency requirement or a fixed-point residency restriction. *See, e.g., Saenz*, 526 U.S. at 505; *Soto-Lopez*, 476 U.S. at 905; *Hooper*, 472 U.S. at 621–22; *Zobel*, 457 U.S. at 57; *Mem'l Hosp.*, 415 U.S. at 251, 261–62; *Dunn*, 405 U.S. at 334–35, 360. This case does not involve such a disparate treatment claim.

The dissent's approach thus expands the right to travel to an unprecedented extent. And it does so through a legal analysis that the Court has rejected repeatedly in the analogous Fourteenth Amendment equal protection context. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977) ("[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact."); *see also Washington*, 426 U.S. at 242. Equal protection jurisprudence is unequivocal: the only relevant consideration is a law's express categorization and any discriminatory purpose. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 207 (2008) (Scalia, J., concurring).

The Supreme Court has never indicated that the neighboring Fourteenth Amendment Privileges or Immunities Clause ought to be evaluated differently, and it is difficult to justify such a distinction. It would be strange indeed if a law that created a disparate impact based on race would be subject to less exacting scrutiny than laws with a disparate impact on the right to travel. Further, one of the primary bases that the Supreme Court gave for rejecting disparate-impact theory—the potential invalidation of many neutral laws—applies with equal force in the right to travel context. *See Washington*, 426 U.S. at 248 (observing that a disparate-impact approach to equal protection claims "would be far-reaching and would raise serious questions about, and perhaps invalidate, a whole range of tax, welfare, public service, regulatory, and licensing statutes"). There is no reason for permitting disparate-impact theory in one context but not the other, especially given how

historically intertwined the Supreme Court's right to travel jurisprudence has been with the Equal Protection Clause.[9]

The Third Circuit has actively refused to take this step. In *Connelly v. Steel Valley School District*, 706 F.3d 209 (3d Cir. 2013), a Pennsylvania school district set its teachers' salaries based on years of teaching experience but gave full credit for years teaching in the district, partial credit for years teaching in Pennsylvania, and reduced credit for years teaching elsewhere. *Id.* at 211–12. A teacher who taught for nine years in Maryland and received one year of credit argued that the school district's salary scheme violated his right to travel. *Id.* at 213. The Third Circuit recognized that the district was not discriminating based on duration of residency but on location of teaching experience. *Id.* at 214. A lifelong Pennsylvania resident who taught across the border in Maryland would have received the same treatment as a similar Maryland resident who moved to Pennsylvania. *Id.* at 214–15. In the Third Circuit's view, "[t]he right to travel simply is not implicated when there is no discrimination based on the duration of one's residency." *Id.* at 215. We agree.

There are good reasons for limiting the right to travel to disparate treatment claims, as we recognized more than a decade before *Saenz*. In *Sklar v. Byrne*, 727 F.2d 633 (7th Cir. 1984), we rejected the suggestion that laws with a disproportionate impact on new residents violate the right to travel. *Sklar* presented a right to travel objection to an ordinance banning

---

[9] Recall that prior to *Saenz*, the Supreme Court often positioned the right to travel within the Equal Protection Clause. *See Zobel*, 457 U.S. at 60 n.6.

unregistered handguns in the City of Chicago. Because one needed to be a Chicago resident to register a handgun for lawful possession—and Chicago stopped new registrations after 1982—Sklar argued that the ordinance violated the right to travel. *Id.* We explained then that this could not be how the right to travel functions, for applying strict scrutiny "based merely on a showing that newer residents would not benefit" would make huge swaths of the law vulnerable. *Id.* at 639. As in *Sklar*, the plaintiffs here want to apply strict scrutiny on the showing that they, as new residents, are "merely one group among several who do not benefit" from the protections of Indiana's Ex Post Facto Clause. *Id.* at 639. We refused the invitation in 1984 and decline it again today.

The Privileges or Immunities Clause of the Fourteenth Amendment simply does not prohibit a state from incidentally burdening travel to or from the state. It guarantees only "the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State." *Saenz*, 526 U.S. at 502. Because both old and new Indiana residents are treated equally under SORA and Indiana's Ex Post Facto Clause, we hold that the law does not violate plaintiffs' right to travel.

## III.

The plaintiffs' equal protection claim is closely intertwined with their right to travel claim, but it remains distinct. Equal protection and right to travel claims require independent analyses—even when the basis for the claims is identical. Under the Privileges or Immunities Clause, if the right to travel is not implicated, that is the end of the plaintiffs' claim. The challenged law either is reviewed under strict scrutiny or not at all. Under the Equal Protection Clause, by contrast,

failure to trigger heightened scrutiny does not end the claim. Courts still review the challenged law to ensure that the state has a rational basis for treating similarly situated people differently. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

The Fourteenth Amendment's Equal Protection Clause guarantees that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Unlike the right to travel, which requires strict scrutiny when implicated, the standard of review applied to laws in equal protection cases varies. We apply strict scrutiny to a law if the plaintiffs' unequal treatment is based on membership in a protected class—race, national origin, religion, or alienage—or denial of a fundamental right. *St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1008 (7th Cir. 2019). When a plaintiff's unequal treatment is premised on a quasi-suspect classification, like gender, we apply intermediate scrutiny. *Id.* at 1008 n.3. In all other cases, courts default to rational basis review. *Id.* at 1008.

Here, plaintiffs argue that the district court correctly applied strict scrutiny when it evaluated SORA. That is because their equal protection theory assumes that SORA violates a fundamental right—the right to travel. We have already held that it does not. SORA treats the plaintiffs differently from other, pre-SORA offenders based on their out-of-state registration requirements—not based on their length of residency. Because Indiana's treatment of the plaintiffs is not based on their membership in a protected class or the denial of a fundamental right, strict scrutiny is inapplicable. Nor does intermediate scrutiny apply. Neither gender nor any other quasi-suspect class serves as the catalyst for the plaintiffs' differential treatment under SORA.

Our determination that heightened scrutiny is inapplicable is not fatal to their equal protection claim, however. It just means that SORA will be assessed under rational basis review. The plaintiffs may still challenge Indiana's application of SORA to them because it treats them differently than similarly situated Indiana offenders. SORA, as modified by the Indiana Supreme Court's constitutional overlay, creates two classes of pre-SORA offenders—those who must register in Indiana, and those who are free from that requirement. Indiana distinguishes between the two groups based solely on whether the pre-SORA offender had a registration obligation in another state. For example: two lifelong Indiana residents, both with pre-SORA convictions, will be treated differently if one commutes into Chicago for work—and so is subject to Illinois's reporting requirements—while the other never leaves Indiana. The distinction holds true for offenders who attend school in another state or who have lived in another state imposing registration obligations on them. In short, two similarly situated Indiana offenders may have vastly different legal obligations simply because one of them has an out-of-state registration obligation. The question is whether Indiana's differential treatment on this basis is rationally related to a legitimate government purpose. *See Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 680 (2012); *FCC*, 508 U.S. at 313 ("[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.").

Because the district court did not address whether SORA satisfies rational basis review, we remand the equal protection claim for this purpose. In doing so, we stress that this review

should be undertaken with care and that the district court should thoroughly develop the factual record on this score. Rational basis review favors the State but does not ensure an automatic win. *See, e.g.*, *Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n*, 488 U.S. 336 (1989) (invalidating a tax assessment on equal protection grounds for failing rational basis review).

## IV.

The plaintiffs' final claim is an ex post facto challenge to SORA. Because we determine that SORA is not a punitive statute, it does not violate the federal Ex Post Facto Clause.

Article I, section 10, clause 1 of the United States Constitution prohibits states from passing ex post facto laws—those which "retroactively alter the definition of crimes or increase the punishment for criminal acts." *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 504 (1995) (quoting *Calder v. Bull*, 3 U.S. (Dall.) 386, 391–92 (1798)). Statutes that transgress the Ex Post Facto Clause, then, share two characteristics: They are "*both* retroactive *and* penal." *Vasquez v. Foxx*, 895 F.3d 515, 520 (7th Cir. 2018); *see also Johnson v. United States*, 529 U.S. 694, 699 (2000).

There is tension in the caselaw regarding the requirements of the retroactivity prong. *Compare United States v. Leach*, 639 F.3d 769, 773 (7th Cir. 2011) (deciding that SORAs are prospective regardless of their reach because they "merely create[] new, prospective legal obligations based on the person's prior history"), *with Does #1-5 v. Snyder*, 834 F.3d 696, 698 (6th Cir. 2016) (holding Michigan's version of SORA retroactive because it applied to offenders convicted prior to the law's enactment), *and Shaw v. Patton*, 823 F.3d 556, 560 (10th Cir. 2016) (holding the same with respect to Oklahoma's version

of SORA). While we recognize this tension, we need not—and do not—revisit our decisions on retroactivity at this time. Here, the plaintiffs did not ask us to overrule our prior decisions, and their ex post facto challenge fails regardless because SORA is not punitive.

In determining whether a statute is punitive, *Smith v. Doe* is our guidepost. There, the Supreme Court addressed whether Alaska's sex offender registration and notification law violated the federal Ex Post Facto Clause. The Court applied what is commonly called the intent-effects test to hold that Alaska's sex offender registration act was not punitive. *Smith*, 538 U.S. at 105–06. Applying that two-step standard, courts first query whether the legislature intended to enact a punitive, rather than a civil, law. If not, the inquiry becomes whether the law is "so punitive either in purpose or effect as to negate [the State's] intention to deem it civil." *Id.* at 92 (internal quotation and citation omitted). To assess a law's effects, *Smith* considered five of the factors originally articulated in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963). Those factors are "whether, in its necessary operation, the regulatory scheme: [1] has been regarded in our history and traditions as a punishment; [2] imposes an affirmative disability or restraint; [3] promotes the traditional aims of punishment; [4] has a rational connection to a nonpunitive purpose; or [5] is excessive with respect to this purpose." *Smith*, 538 U.S. at 97.

This is a challenging standard for plaintiffs. When assessing whether a law is punitive, "we ordinarily defer to the legislature's stated intent." *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997). If the legislative intent is to enact a civil law, only the "clearest proof that the statutory scheme is so punitive in either purpose or effect" will suffice to override it. *Seling v.*

*Young*, 531 U.S. 250, 261 (2001); *Hudson v. United States*, 522 U.S. 93, 104 (1997); *see also Smith*, 538 U.S. at 92.

The plaintiffs have conceded that Indiana intended to enact a civil, regulatory scheme when it passed SORA. We thus consider only whether SORA is so punitive in effect as to override Indiana's nonpunitive intent. To that end, we address the *Mendoza-Martinez* factors in turn.

### 1. Historical and traditional forms of punishment

Plaintiffs present three historical forms of punishment—shaming, banishment, and parole/probation—and argue that SORA's requirements are tantamount to these sanctions. All three comparators suffer the same infirmity: SORA does not *actually* inflict what is historically and traditionally considered punishment.

The plaintiffs first argue that SORA's publication of their classifications—such as "sexually violent offender" or "offender against children"—is "designed to outrage" and stigmatizes without a present assessment of individual dangerousness. In this regard, SORA goes further than the statute in *Smith*, which assigned no categorical labels to offenders. But SORA's classification scheme falls short of public shaming for the same reason as the Alaska statute in *Smith*. Indiana classifies offenders based on offense type and in doing so, transmits accurate information about the underlying conviction—a matter of public record. To the extent that stigma results, it arises "not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record." *Smith*, 538 U.S. at 98. *But see Does #1-5*, 834 F.3d at 703 (concluding that the "ignominy" results from the statute's application of labels, not from conviction information).

The plaintiffs also suggest that SORA's residency restrictions are akin to banishment, but we rejected this assertion when evaluating the Illinois sex offender registration statute. *Vasquez*, 895 F.3d at 521. We reasoned that although residency restrictions limit offenders' living and employment options, they do not amount to banishment—which traditionally meant that persons "could neither return to their original community nor … be admitted easily into a new one." *Id.* (internal quotation and citation omitted). The plaintiffs acknowledge our precedent but note that the Indiana restriction is 500 feet greater than the Illinois restriction. The difference between a 500- and 1,000-foot residency restriction is not constitutionally significant, however, because it does not render SORA's requirements any more similar to banishment.

Lastly, the plaintiffs contend that SORA's restrictions on where they may live or work, in tandem with its in-person reporting requirements, make it analogous to parole or probation. This is a closer call. In *Smith*, the Supreme Court acknowledged that a comparison between the Alaska statute and parole "has some force." *Smith*, 538 U.S. at 101. Even so, the Court held that the statute was distinguishable because it lacked two key characteristics of parole: (1) mandatory conditions, and (2) the option for a supervisor "to seek the revocation of probation or release in case of infraction." *Id.* The Court emphasized that Alaska's reporting requirements were not in-person and that offenders could "move where they wish" and live and work without supervision. *Id.* SORA differs from the Alaska statute on these points.[10] We conclude, however,

---

[10] While SORA employs mechanisms like those used in parole and probation, we note that it does not subject offenders to the same degree of

that it is still distinct from parole because it lacks the second defining feature of parole discussed by *Smith*. To be sure, plaintiffs may face criminal prosecution for failure to comply with reporting requirements. But that would be a consequence distinct from the plaintiffs' original offenses; parole and the supervisor's ability to seek revocation of it are tied to the terms of the original offense. A sex offender who violates SORA is not subject to revocation—but rather a new criminal prosecution for violating state law. *Shaw*, 823 F.3d at 566. *But see Snyder*, 834 F.3d at 703. Thus, a sex offender covered by SORA is not under the same type of supervision as a parolee.

On balance, SORA's requirements do not amount to traditional forms of punishment. So, this factor, while close, tips in favor of Indiana.

### 2. Affirmative disabilities or restraints

The next factor considers whether SORA subjects the plaintiffs to an "affirmative disability or restraint." *Mendoza-Martinez*, 372 U.S. at 168. The boundaries of this factor are undefined. The Alaska law in *Smith* required offenders to register and mandated reporting of any changes to facial features or plans to borrow a car or procure psychiatric treatment. *Smith*, 538 U.S. at 101. The Court held that these requirements

---

scrutiny or control. *See Vasquez*, 895 F.3d at 521 (concluding that Illinois's SORA, despite limiting where offenders could live, did not resemble the "comprehensive control" of probation). For example, SORA entails some supervision—law enforcement officers must do annual check-ins to verify an offender's physical address—but this differs in degree and type from the monitoring of parolees and probationers. *See Shaw*, 823 F.3d at 564–65 ("Historically, a probation officer took a far more active role in a probationer's life than simply collecting information for a database.").

"make a valid regulatory program effective and do not impose punitive restraints." *Id.* at 102. In doing so, the Court underscored that the statute "imposes no physical restraint, and so does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint." *Id.* at 100. It also emphasized that the "Act's obligations are less harsh than the sanctions of occupational debarment, which we have held to be nonpunitive." *Id.* While the Court observed that Alaska's SORA did not require in-person reporting or restrict offenders' ability to change jobs or residences, the Court gave no indication whether such requirements would constitute punitive disabilities or restraints. *Id.* at 100–01.

Outside the "paradigmatic" example of physical restraint, it is not evident what statutory requirements amount to a restraint or disability. What is clear is that very few burdens are significant enough to tip the scale. *See, e.g.*, *Hudson*, 522 U.S. at 104 (monetary fine and occupational debarment are not affirmative disabilities or restraints "as that term is normally understood"); *Flemming v. Nestor*, 363 U.S. 603, 617 (1960) (denial of a noncontractual government benefit is not an affirmative disability or restraint); *see also Vasquez*, 895 F.3d at 522 ("[L]ike the registration scheme at issue in *Smith*, the residency law imposes no physical restraint[] and so does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint." (internal quotation and citation omitted)). Even when the Supreme Court confronted a state law imposing a paradigmatic form of restraint—involuntary confinement—the Court held that this did not make the law punitive. *Hendricks*, 521 U.S. at 363. Here, it is sufficient to note that to the extent that SORA's obligations amount to restraints or disabilities, standing alone

they are not sufficiently severe in view of Supreme Court precedent to make SORA punitive.

### 3. Promotion of traditional aims of punishment

Plaintiffs next suggest that SORA has punitive aims—specifically, incapacitation, deterrence, and retribution. The Supreme Court has rejected these arguments in the context of other sex offender registration laws, however. *See, e.g.*, *Smith*, 538 U.S. at 102 ("Any number of governmental programs might deter crime without imposing punishment."); *Hudson*, 522 U.S. at 104–05 (holding that the involuntary commitment of a child sex offender was not retributive because prior conviction was used as evidence of future dangerousness, not to assign culpability). We similarly were unpersuaded that the residency restrictions at issue in *Vasquez* furthered traditional punitive aims in lieu of the Illinois SORA's "obvious aim" to "protect children." *Vasquez*, 895 F.3d at 522. The Sixth Circuit has also "accordingly give[n] this factor little weight," recognizing that civil statutes often pursue these aims, too. *Does #1-5*, 834 F.3d at 704. Because the plaintiffs have failed to show why the analyses in these cases do not apply with equal force to the same arguments that they raise here, this factor favors Indiana.

### 4. Rational connection to a nonpunitive purpose

Whether the law has a "rational connection to a nonpunitive purpose" is "a most significant factor in our determination that the statute's effects" are not punitive. *Smith*, 538 U.S. at 102 (internal quotation and citation omitted). We begin by identifying a nonpunitive purpose and then turn to whether the law's requirements are rationally connected to that goal.

One aim of SORA is to advance public safety, particularly for vulnerable minors. *See Smith*, 538 U.S. at 93 ("[A]n imposition of restrictive measures on sex offenders adjudged to be dangerous is a legitimate nonpunitive governmental objective and has been historically so regarded." (internal quotation and citation omitted)). No one disputes this nonpunitive purpose. The disagreement centers instead on whether SORA's requirements are rationally related to that aim. We are satisfied that they are.

Laws that result in consequences for offenders' prior conduct are not automatically punitive if they are connected to a regulatory purpose that falls within the power of the state, such as public safety. *Flemming*, 363 U.S. at 616. Deportation, for example, is "an exercise of the plenary [power] of Congress to fix the conditions under which aliens are permitted to enter and remain in this country." *Id.* While it presents a consequence for people who have unlawfully entered the United States, that does not convert a lawful exercise of congressional power into a *punishment*. Similarly, the Supreme Court has held that excluding former felons from practicing a profession "is an incident of the State's power to protect the health and safety of its citizens"—"not a purpose to add to the punishment of ex-felons." *Id.* So, too, here. SORA's registration requirements rationally relate to Indiana's power to protect the safety of its citizens, despite its burden on sex offenders. *See Shaw*, 823 F.3d at 572 (explaining that Oklahoma's "reporting requirements are also consistent with a non-punitive intent—promoting public safety—by facilitating law enforcement's identification of sex offenders and notification to the public of potential dangers"). This critical factor supports Indiana.

### 5.   Excessive with respect to that purpose

The touchpoint for the excessiveness factor is "whether the regulatory means chosen are reasonable in light of the nonpunitive objective," not whether "the legislature has made the best choice possible to address the problem it seeks to remedy." *Smith*, 538 U.S. at 105. The burden is on the plaintiff to establish that the law's "nonpunitive purpose is a sham or mere pretext." *Id.* at 103 (internal quotation and citation omitted).

While the plaintiffs proffer several arguments on this factor, they fall short of meeting their burden. First, they contend that SORA does not further its goal, making its requirements excessive. The plaintiffs cite a study showing that sex offenders do not recidivate at higher rates than other felons. The implication is that SORA's registration requirements will not bolster public safety because sex offenders do not present an outsized threat. This conclusion is flawed. The plaintiffs' study does not establish that sex offenders pose little risk to the public, just that their risk of reoffending is similar to that of other ex-felons. *See Vasquez*, 895 F.3d at 522 ("[S]imilar recidivism rates across different categories of crime would not establish that the nonpunitive aim of this statute—protecting children—is a sham.").

The plaintiffs also take issue with SORA's application to all offenders "without regard to their future dangerousness." But the Supreme Court "has upheld against ex post facto challenges laws imposing regulatory burdens on individuals convicted of crimes without any corresponding risk assessment." *Smith*, 538 U.S. at 104; *see, e.g., De Veau v. Braisted*, 363 U.S. 144, 159–60 (1960) (plurality opinion) (upholding a law that prohibited former felons from working as union officers).

Although *Smith* recognized that the "magnitude of the restraint" could require individual assessments in some cases, such cases are the exception. *Smith*, 538 U.S. at 104 (discussing the involuntary and potentially indefinite confinement at issue in *Hendricks* as one example). Indiana is not required to make individualized judgments before imposing its registration requirements. This factor favors Indiana.

***

At best, the plaintiffs have shown that SORA partially resembles one historical punishment and may place some affirmative restraints or disabilities on them. The remaining factors, including the law's rational relation to a nonpunitive purpose, all support Indiana. The plaintiffs have not carried their heavy burden of proving that SORA is so punitive in effect as to override the Indiana legislature's intent to enact a civil law. As the plaintiffs acknowledge, "the Alaska statute at issue in [*Smith*] shares several core provisions with Indiana's SORA." While SORA goes farther than the Alaska law in some respects, it is not so far afield as to warrant a different outcome than in *Smith*.

V.

We hold that Indiana's SORA neither violates plaintiffs' right to travel nor constitutes an impermissible ex post facto law. Accordingly, we reverse the district court's entry of summary judgment and remand for further analysis of the equal protection claim consistent with this opinion.

REVERSED AND REMANDED

SCUDDER, *Circuit Judge*, concurring. I join the majority opinion and write separately to address one aspect of the opinion—the retroactivity inquiry of the *Ex Post Facto* Clause.

Our case law on the retroactivity prong needs a course correction. See *Vasquez v. Foxx*, 895 F.3d 515 (7th Cir. 2018); *United States v. Leach*, 639 F.3d 769 (7th Cir. 2011). The pertinent retroactivity inquiry is whether the law "imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Carmell v. Texas*, 529 U.S. 513, 540 (2000) (quoting *Cummings v. Missouri*, 71 U.S. 277, 325–26 (1867) (internal quotation marks omitted)).

But in *Leach* we suggested otherwise, determining that the federal SORNA was not impermissibly retroactive because it "merely creates new, prospective legal obligations based on the person's prior history." 639 F.3d at 773; see also *Vasquez*, 895 F.3d at 520 (applying *Leach*'s retroactivity holding to Illinois's SORA). Though this observation about how SORNA functions is descriptively correct, it misses the mark on the retroactivity inquiry. What *Leach* and *Vasquez* failed to account for is that the registration obligations did not apply at the time the sex offenders committed the offenses triggering registration—meaning that the sex offender registration laws imposed obligations beyond those prescribed at the time of the offense.

The majority opinion acknowledges this tension in our case law but stops short of fixing it. See Maj. Op. 23. I would take the next step and use today's decision to align our law with Supreme Court precedent. The issue is sure to surface in future cases and our sitting *en banc* provides the perfect opportunity for the full court to issue the course correction.

There is no question that the obligations imposed by Indiana's SORA on the six plaintiffs in this case apply retroactively, and we should use today's decision to say so.

ROVNER, *Circuit Judge*, with whom WOOD and HAMILTON, *Circuit Judges*, join, concurring in part and dissenting in part. I join all but Part II of the court's opinion today. I remain convinced that Indiana's other jurisdiction provision[1] deprives the plaintiffs of state citizenship on equal terms with other Indiana residents and in so doing violates their right to travel. I therefore dissent from that part of the court's decision.

1.

Encompassed within the right to travel is the right to relocate from one state to another and, upon establishing bona fide residence in a new state, to enjoy the same privileges and immunities as any other citizen of that state. *Saenz v. Roe*, 526 U.S. 489, 502, 119 S. Ct. 1518, 1526 (1999). Each of the six plaintiffs in this case has been denied the benefit of Indiana's *ex post facto* provision[2] that a similarly-situated, but lifelong Indiana resident would receive. Because each of the plaintiffs committed a sex offense before Indiana attached a registration obligation to that crime, the Indiana Supreme Court's decision in *Wallace* precludes the State from relying on their convictions as the basis for requiring them to register. *Wallace v. State*, 905 N.E.2d 371, 384 (Ind. 2009). What Indiana has done instead is to rely on the fact that each of the plaintiffs previously was required to register in another state as the basis for imposing its own registration obligation on them. Had any of the

---

[1] *See* Ind. Code § 11-8-8-4.5(b)(1) (defining "sex offender" who must register in Indiana to include "a person who is required to register as a sex offender in any jurisdiction"); § 11-8-8-5(b)(1) (similarly defining "sex or violent offender" who must register).

[2] Ind. Const., art. 1, § 24 ("No *ex post facto* law … shall ever be passed.").

plaintiffs been a resident of Indiana at the time of his offense and never traveled anywhere that burdened him with a duty to register, Indiana itself would not have imposed such a burden on him. It is thus *only* their travel—in this case, relocation from another state to Indiana—that renders them subject to a registration obligation in Indiana. This sets up the very sort of tiered classes of state citizenship that the Supreme Court's travel jurisprudence forbids.[3] The fact that a lifelong Indiana resident may also incur an obligation to register in Indiana by working or studying in another state that imposes such a duty on him does not obviate the problem; it simply makes clear that Indiana is relying on the fortuity of a person's travel to burden its citizen with an obligation that it would not otherwise impose.

At bottom, what Indiana is doing is assigning differential obligations to its citizens based not on what they have done but where they have been. It is relying on another state's handling of a particular criminal history to determine how that

---

[3] The number of individuals who can assert the particular right-to-travel claim the plaintiffs are asserting in this case is necessarily limited and dwindling. Anyone convicted of a sex offense since the mid-1990s or later (*i.e.*, after registration requirements were first adopted in Indiana and elsewhere) will likely be subject to registration in Indiana based on their criminal histories. *Wallace* only poses an obstacle to imposing registration obligations on someone convicted before Indiana made his crime (or its out-of-state equivalent) a registrable offense. So, with respect to the vast majority of offenders, Indiana will not have to rely on the other jurisdiction requirement as it must with respect to the six plaintiffs in this case, all of whom were convicted in 1994 or earlier and are now in their fifties or sixties.

individual will be treated in Indiana. So a sex offender whose crime would not otherwise trigger a registration obligation as a matter of Indiana law will nonetheless be required to register because *another* state, as a matter of its own law, required him to register so long as he lived, worked, or studied in that state. Indiana thus is relying on another state's legal rules to circumscribe his rights as an Indiana citizen. This is incompatible with the holdings and the logic of the Supreme Court's right-to-travel cases.

2.

One point should be made clear at the outset: In taking notice that another state has imposed a registration obligation on one of its citizens, Indiana is not purporting to enforce another state's judgment or to implement the registration obligation that state has imposed. This would be a very different case if that were the aim and effect of Indiana's other jurisdiction provision. But it is not. Indiana instead is relying on the historical fact that another state required an offender to register there (whenever and for however long) as the basis for imposing its *own* registration obligation on one of its citizens. *See State v. Zerbe*, 50 N.E.3d 368, 370 (Ind. 2016) ("it is not Zerbe's *crime* that triggers his obligation to register as a sex offender in Indiana; rather it is his *Michigan registry requirement* that does so") (emphasis in original). This new obligation is not in any way tethered to the life of the registration obligation imposed by the other state. It is not as if, for example, an offender who was required by California to register for a period of 10 years and seven years into that obligation moves to Indiana will now have to register for an additional three years in Indiana in order to complete the 10-year term that California imposed. It does not matter to Indiana's other jurisdiction

provision for how long an offender was required to register in another state or when that obligation expires. It only matters to Indiana's registration scheme that there was a prior obligation, period. And how lengthy the new registration obligation will be in Indiana is a matter answered by Indiana law. Thus, whereas the other state may only have required an offender to register for a period of years, Indiana may require him to register for the remainder of his life. Take plaintiff Patrick Rice, for example. Based on his 1989 conviction for aggravated sexual assault, Rice was required by Illinois to register for a period of 10 years upon his release from prison in 2017, but when he subsequently relocated to Indiana to live with his sister, Indiana imposed a lifetime registration obligation on him, because his Illinois offense makes him a "sexually violent predator" under Indiana law. *Cf. Jensen v. State*, 905 N.E.2d 384, 394 (Ind. 2009) (statutory revisions to registration scheme which have effect of lengthening Indiana offender's existing registration obligation from 10 years to life do not amount to *ex post facto* violation).

So in no sense is this case one about the enforceability of another state's judgment or the comity that Indiana must afford to that judgment. Indiana is simply relying on an offender's registration history in another state as the basis for implementing its own, independent duty to register in Indiana. And it is doing so in circumstances where the offender's criminal history itself would not trigger a registration obligation as a matter of Indiana law.

Over the course of this litigation, Indiana has cited two related reasons for relying on a prior registration obligation imposed elsewhere as the basis for imposing a duty to register in Indiana. First, Indiana is concerned that it not become a

haven for sex offenders who, like the plaintiffs here, committed sex offenses before those offenses became subject to registration in Indiana and whom the state, under *Wallace*, cannot require to register based on that criminal history. Second, Indiana is using the other jurisdiction requirement as a secondary, catchall criterion for requiring registration of individuals whose particular crimes happen not to fall within any of the categories of offenses that the Indiana legislature has thus far identified as crimes requiring registration.

It goes without saying that Indiana has a legitimate interest in implementing registration obligations as a means of protecting its citizenry from individuals who might repeat their prior sex offenses. I can also appreciate the state's wish not to allow an offender to escape a duty to register in Indiana simply because his specific sex offense is not one that the legislature thought to identify in the drafting process as one warranting registration. *But see Edwards v. California*, 314 U.S. 160, 173, 62 S. Ct. 164, 167 (1941) ("no boundar[y] to the permissible area of State legislative activity … is more certain than the prohibition against attempts on the part of any single State to isolate itself from difficulties common to all of them by restraining the transportation of persons and property across its borders"); *Shapiro v. Thompson*, 394 U.S. 618, 629, 89 S. Ct. 1322, 1329 (1969) ("the purpose of inhibiting migration by needy persons into the State is constitutionally impermissible"), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651, 671, 94 S. Ct. 1347, 1359–60 (1974).

But Indiana is among a minority of jurisdictions that regards sex offender registration as punitive and thus subject to

the *ex post facto* clause of its constitution.[4] Thus, as a matter of its own law, Indiana cannot require the six plaintiffs in this case to register based solely on their criminal histories, as the plaintiffs committed their crimes before the state legislature first made them registrable offenses. *Wallace* precludes the state from effectively increasing their punishment after the fact.

By looking instead to a registration obligation imposed by another state as the basis for imposing its own obligation on the plaintiffs, Indiana nominally avoids the *ex post facto* problem.[5] But in doing so, it has created another, federal

---

[4] Some eight state supreme courts have held that the retroactive application of sex offender registration and notification laws violate their respective state constitutions. *See* U.S. Dep't of Justice, Office of Justice Programs, Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, & Tracking, *Sex Offender Registration and Notification in the United States, Current Case Law and Issues—March 2019: Retroactive Application & Ex Post Facto Considerations*, at 1–2 & n.9, available at https://smart.ojp.gov/sorna/current-law/case-law-updates.

[5] I say nominally because the rationale of the Indiana cases is that Indiana is premising its registration obligation solely upon the obligation imposed by the offender's former domicile and not on his underlying criminal offense, *e.g.*, *Zerbe*, 50 N.E.3d at 370, with the result that his obligation to register is effectively continued across state lines, *Tyson v. State*, 51 N.E.3d 88, 96 (Ind. 2016). (Of course, there would have been no duty to register in the first instance but for the particular offense he committed, and that offense would not trigger a duty to register under Indiana law.) I am not confident this rationale holds up in all applications of Indiana's other jurisdiction requirement, however. Two of the plaintiffs, Gary Snider and Adam Bash, relocated to Indiana three and six years, respectively, before the Indiana legislature adopted the other jurisdiction provision in 2006. Although they had been required to register in their former domiciles, those registration obligations would have effectively come to an end once they moved to Indiana, at least absent an assertion of

constitutional problem. Relying on an obligation that another state has imposed as a matter of its own law as the determinant for how a new Indiana citizen will be treated in Indiana interferes with his right to travel. It is only because each plaintiff lived somewhere else previously that he can now be required to register as a matter of Indiana law. And upon their relocation to Indiana each finds his rights vis-à-vis registration defined by his former domicile: only because he once lived somewhere that authorized registration for his offense may he be required to register in Indiana, whose own law would not have permitted a registration obligation based on the very same criminal history. *See Saenz*, 526 U.S. at 505, 119 S. Ct. at 1527 ("the right to travel embraces the citizen's right to be treated equally in her new state of residence"); *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 623, 105 S. Ct. 2862, 2868 (1985) ("The State may not favor established residents over new residents based on the view that the State may take care of 'its own,' if such is defined by prior residence. Newcomers, by establishing bona fide residence in the State, become the State's 'own' and may not be discriminated against solely on the basis of their [date of] arrival in the State … ."); *Shapiro*, 394 U.S. at 633, 89 S. Ct. at 1330 ("We recognize that a State has a valid interest in preserving the fiscal integrity of its

---

extraterritorial authority by their former home states. So in their cases, it would be difficult for Indiana to claim that application of the other jurisdiction provision simply maintained their prior registration obligations across state lines. (Of course, we also know that Indiana initially required Snider and Bash to register based on their criminal histories; but the 2009 decision in *Wallace* made plain in hindsight that the State lacked the authority to require Snider and Bash to register on that basis.)

programs. … But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens.").

3.

My colleagues in the majority characterize the effect of the other jurisdiction provision on the plaintiffs as merely one of disparate impact rather than one of disparate treatment. It is true enough that the statute does not draw express distinctions based on a person's residency. But the statute on its face does take notice of an individual's treatment in another jurisdiction and uses his treatment elsewhere as the template for how he will now be treated as an Indiana citizen, under Indiana law. In doing so, the statute necessarily implicates his travel history. More to the point, it creates distinct classes of Indiana citizenship that turn upon what rights and obligations an individual has been assigned by another state. In some instances, the effect is benign; in others, the individual loses important freedoms he would have enjoyed as an Indiana citizen had he never relocated from or traveled to another state. In *all* applications of the statutory provision at issue here, it is the person's travel history, and his treatment in another jurisdiction, that define his rights as an Indiana citizen going forward. The burdens that the plaintiffs in this case, and other Indiana offenders like them, must shoulder as a result of the other jurisdiction provision are not the unintended consequence of a statute that is otherwise neutral vis-à-vis the right to travel. The very purpose of the statute is to use the fact of one's prior presence in another jurisdiction to circumscribe his rights as an Indiana citizen. This is not disparate impact. It is, overtly and unmistakably, disparate treatment. Although the Supreme Court has not yet confronted the particular fact pattern presented here, its teachings show us why

Indiana's registration scheme unconstitutionally burdens the plaintiffs' right to travel.

4.

The majority relies on two features of Indiana's other jurisdiction provision to distinguish it from the sorts of durational residency schemes that the Supreme Court has deemed to violate the right to travel. First, if a sex offender relocates to Indiana from another state that did not require him to register, Indiana's other jurisdiction provision will not by its terms compel him to register in Indiana. Second, relocating to Indiana is not the only way of triggering the other jurisdiction provision: The provision also comes into play when an Indiana resident—however longstanding—travels to another state for work or study (while remaining an Indiana resident) and is required to register in that state so long as he is present for those purposes. To the majority's way of thinking, these provisions show that Indiana is not discriminating based on the length of one's residency in Indiana, as has typically been the case in the Supreme Court's jurisprudence.

Certainly the timing and duration of one's residency in Indiana is not the sole determinant of whether its other jurisdiction provision will compel him to register as a sex offender in Indiana. If anything, however, the way in which Indiana's other jurisdiction provision operates makes plain that Indiana is relying exclusively on how one was treated in another state to determine how he will be treated in Indiana. This cannot be reconciled with what I understand to be the animating rationale of the Supreme Court's right-to-travel cases. I will take each feature of the Indiana provision, including its application to relocating persons like the plaintiffs, in turn to explain my view.

5.

Start with the benign application of the other jurisdiction provision: If an offender relocates to Indiana from a state that did not require him to register, then he will not be made to register in Indiana. I agree with the majority that this is one aspect of the provision showing that Indiana is not invariably discriminating against residents who relocate from other states.

Of course, as the majority recognizes, this was true in *Saenz* as well. For the recipients of public benefits who were relocating to California from other states, California capped the amount of such benefits such individuals could receive during their first year of residence in California at the levels they received in their prior states of residence for a period of one year. But not every state had public benefit levels that were lower than California's relatively generous payments; a handful gave their residents equal or greater benefits. Individuals relocating from those states thus suffered no disadvantage as a result of their relocation; they received the same benefit amounts upon relocation that a long-standing Californian would. 526 U.S. at 497 & n.8, 119 S. Ct. at 1523 & n.8. That did not move the Supreme Court. It still found the scheme as a whole one that impermissibly discriminated against new residents based on their recent arrival in California. *Id.* at 505–07, 119 S. Ct. at 1527–28.

So the fact that not *every* sex offender who relocates to Indiana from another state or travels from Indiana to another state will incur a registration obligation as a result does not rule out the possibility that Indiana is interfering with the right to travel—indeed, it confirms that what Indiana is doing is using another state's treatment of a sex offender as a proxy

for how he should be treated in Indiana. If an offender is fortunate enough to travel to or relocate from a state that does not impose a registration obligation on him, Indiana will not do so; but if the other state does require him to register, then Indiana will as well. Either way, Indiana is relying on another state's treatment of the offender as dispositive of how he will be treated in Indiana.

6.

This is unquestionably the case with the six plaintiffs before us. All six committed a sex offense in or before 1994, when Indiana adopted the original version of its Sex Offense Registration Act (SORA). Because the plaintiffs' crimes were committed before they became registrable offenses under Indiana law, *Wallace* precludes the state from imposing a registration obligation based on their criminal histories. *Wallace* treats registration as a punishment, and thus one that Indiana's *ex post facto* provision rules out for offenses taking place before registration became proscribed for an individual's offense. Had the plaintiffs been living in Indiana at the time of their offenses and remained there afterward, they would be free today of any obligation to register under *Wallace*.

For the plaintiffs, it is the fact that they relocated to Indiana at a later date, and from other states that required them to register, that deprives them of the benefit of Indiana's *ex post facto* provision. Although their crimes were such that, if committed in Indiana, they would not be registrable offenses under *Wallace*, because each of the plaintiffs lived previously in a jurisdiction that treated the offenses as registrable—and saw no *ex post facto* problem with doing so—Indiana seizes on the prior registration obligation itself to demand registration

in Indiana. It is thus one's relocation from such a state that is the trigger for the registration obligation in Indiana.

Plaintiff Brian Hope's history makes plain the problem. Hope in fact committed his sex offense in Indiana. He committed the offense in 1993 and pleaded guilty in 1996. In 2000, he completed his probation. In 2004, he moved to California and later to Texas, where he was required to register under Texas law based on his Indiana conviction.[6] When he returned to Indiana in 2013 to help care for an ailing family member, Indiana invoked the other jurisdiction provision to require him to register in Indiana. Given the date of his offense, Indiana law does not treat his criminal history as one requiring registration: Again, *Wallace* holds that the state's *ex post facto* provision forbids it. But because Hope previously lived in Texas, which *did* treat his offense as one requiring registration, Indiana relies on the prior registration obligation itself to demand that he register in Indiana. But for his travel to and from Texas, Hope would have no such obligation as a matter of Indiana law. *See also Ammons v. State*, 50 N.E.3d 143, 144–45 (Ind. 2016) (per curiam) (no *ex post facto* violation where Indiana resident committed sex offense pre-SORA, later moved to Iowa, which required him to register based on his Indiana conviction, and upon subsequent return to Indiana was required to register based on the Iowa registration obligation).

The same, of course, is true with respect to the other five plaintiffs. Like Hope, they committed sex offenses (albeit not

---

[6] Hope himself does not concede that Texas required him to register based on his Indiana conviction. For present purposes, I am accepting Indiana's representation that he was required to register on this basis.

in Indiana) that were not registrable in Indiana when the crimes took place. So under *Wallace*, Indiana's *ex post facto* provision would bar the state from imposing a registration requirement based on their criminal histories. Instead, the state looks to the obligations imposed on the plaintiffs by their former states of residence as the trigger for registration in Indiana.

As a consequence of this scheme, the plaintiffs arrived in Indiana with a lesser set of rights than otherwise similarly-situated Indiana offenders. Rather than treat the offender's criminal history as the dispositive factor in deciding whether registration is required—and permitted by Indiana's *ex post facto* provision—Indiana has looked instead to what civil burdens an offender's former state of residence imposed on him and adopts those burdens as its own.

In effect, the state is treating an offender who moved to Indiana from, say, New York, where he was required to register, as if he remains a citizen of New York for registration purposes, and he cannot claim the benefit of Indiana's *ex post facto* clause in the same way that a lifelong Indiana resident with the identical criminal history can. Even Hope, who was an Indiana resident when he committed his sex offense, has lost the benefit of Indiana's *ex post facto* decision because he left Indiana and for a time resided in another state which burdened him with a registration obligation that *Wallace* foreclosed Indiana from imposing. Because he was formerly a citizen of Texas, Indiana requires Hope to carry the same burden as a Hoosier that he carried as a Texan.

7.

This unique feature of Indiana's registration scheme—requiring registration based not on one's criminal history and on how Indiana law treats that history, but rather on how another state treated that history as a matter of its own law (even if it is an Indiana criminal history)—implicates the core concerns that have animated the Supreme Court's right-to-travel decisions. Indiana is classifying the six plaintiffs based on their prior domiciles and assigning them a lesser set of rights (no *ex post facto* protection vis-à-vis registration obligations) and a greater set of burdens (the duty to register as a sex offender, in some cases for life) as compared with similar offenders who lived in Indiana before its SORA was adopted and have remained there since. As more recently arrived residents of Indiana, the plaintiffs do not enjoy all of the same rights and privileges as other Indiana residents. *See Saenz*, 526 U.S. at 505–07, 119 S. Ct. at 1527–28 (invalidating California scheme temporarily capping amount of public aid new residents could receive to amounts they received in their former domiciles); *Attorney General of N.Y. v. Soto-Lopez*, 476 U.S. 898, 911–12, 106 S. Ct. 2317, 2325–26 (1986) (invalidating civil service employment preference limited to veterans who resided in state at time they entered military service); *Hooper*, 472 U.S. at 622–23, 105 S. Ct. at 2868–69 (invalidating property tax exemption limited to veterans who resided in state prior to specified date); *Zobel v. Williams*, 457 U.S. 55, 64–65, 102 S. Ct. 2309, 2314–15 (1982) (invalidating distribution of public oil dividends to state residents based on the length of their residency in state); *Mem. Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 269, 94 S. Ct. 1076, 1088 (1974) (invalidating requirement that citizen must reside in state for period of one year before becoming eligible for non-emergency medical care at public expense);

*Shapiro*, 394 U.S. at 633, 89 S. Ct. at 1330 (invalidating various provisions requiring one year's residence in state to be eligible for public aid).

To be sure, there are factual differences between the offender-registration scheme at issue here and the public benefit schemes the Court has addressed previously. Indiana is not imposing a durational residency requirement as California did in *Saenz*: it is not requiring any and all offenders who were required to register in their former states to register in Indiana for a period of one year after their relocation, for example, after which the state will re-evaluate whether they must continue to register in Indiana based on their criminal histories. Indiana's scheme is more like a fixed-point residency scheme, in the sense that had the plaintiffs all established residency in Indiana by 1994 and remained there continuously thereafter, they would have no obligation to register; but having instead relocated to Indiana at later dates, they do have to shoulder the burdens of registration. *Cf. Soto-Lopez*, 476 U.S. 898, 106 S. Ct. 2317 (veteran must have resided in state at the time he entered military service in order to qualify for veterans' civil service preference); *Hooper*, 472 U.S. 612, 105 S. Ct. 2862 (veteran must have been a state resident by specified date in order to qualify for tax exemption). Even that analogy is imperfect because, as the majority reminds us, any Indiana resident can become subject to a registration obligation by commuting to another state that requires him to register there. (More on that aspect of Indiana's scheme in a moment.)

But what Indiana's registration scheme has in common with *Saenz* in particular is that Indiana is looking to an individual's treatment by his former state of residence as the determinant for how he will be treated by Indiana, and limiting

his rights as an Indiana citizen based on the rules of his former domicile. Had Hope never left Indiana, he would by virtue of the *Wallace* decision be free of any obligation to register today. But because he left Indiana and for a time resided in Texas, whose own *ex post facto* clause did not preclude the imposition of a registration obligation upon him, he now occupies a distinct tier of Indiana citizenship which requires him to register for life. In one respect, his case is like that of a veteran who did not yet live in New Mexico as of the qualifying eligibility date the state established for a special tax break for veterans. *Hooper*. In another, he is like a public aid recipient relocating to California, who is assigned a lesser set of benefits upon arrival from another state, *Saenz*, except that here the benefit in question is not public aid but one's ability to invoke Indiana's *ex post facto* protections, and instead of being temporary, the lesser benefit is permanent. *Cf. Soto-Lopez*, 476 U.S. at 909, 106 S. Ct. at 2324 (plurality) ("a permanent deprivation of a significant benefit, based only on the fact of nonresidence at a past point in time, clearly operates to penalize appellees for exercising their right to migrate").

Certainly it is true that the Supreme Court has not addressed the right to travel in this particular context. But what it has already said about a state's obligation to treat newcomers on equal terms with longer-term residents applies with equal force here. With respect to the state's *ex post facto* guarantee, Indiana is treating each of the plaintiffs as a stranger rather than one of its own, relegating them to the more burdensome status they held in their prior domiciles as offenders subject to punitive registration requirements. *Cf. Mem. Hosp.*, 415 U.S. at 261–62, 94 S. Ct. at 1084 ("Not unlike the admonition of the Bible that, 'Ye shall have one manner of law, as well for the stranger, as for your own country,' Leviticus 24:22

(King James version), the right of interstate travel must be seen as insuring new residents the same right to vital government benefits and privileges in the States to which they migrate as are enjoyed by other residents.").

8.

But what of the fact that any citizen of Indiana, however long he has resided in the state, can incur a registration obligation simply by commuting to another state that requires him to register so long as he is present there? *See*, *e.g.*, 730 Ill. Comp. Stat. 150/3(a-5) ("An out-of-state student or out-of-state employee shall, within 3 days after beginning school or employment in this State, register in person and provide accurate information as required by the Department of State Police."). Certainly this is another point of distinction between this case and the Supreme Court's precedents, and as the majority points out, this application of Indiana's scheme shows that residency per se is not always the triggering factor for the obligation to register (although it is for the plaintiffs). But one's travel certainly is the trigger, and as in the case of relocation to Indiana from another state, one's travel for work or study to another state that requires registration while there again results in the permanent loss of rights vis-à-vis other Indiana citizens. Although the commuter scenario is not presented in this case, it implicates the Supreme Court's right-to-travel jurisprudence just as surely as the plaintiffs' relocation scenario does.

Consider what happens when a lifelong Indiana resident who was convicted of a sex offense pre-SORA commutes to another state—neighboring Illinois, for example—for work or study and must register there as a matter of Illinois law. Now he has been required to register in another jurisdiction, and

Indiana can cite that Illinois registration requirement as the basis for requiring him to register in Indiana. As a result of his travel, this individual has now effectively lost the benefit of Indiana's *ex post facto* clause and the *Wallace* decision. His criminal history is precisely the same as it was before. He has not violated the terms of supervision or a protective order, or taken some other action that suggests he poses an increased risk of recidivism or danger to others. Nothing about his background has changed except for the fact that he traveled to another jurisdiction that required him to register as a matter of its own law (including its own *ex post facto* jurisprudence), so long as he was present in that other state. Without ever surrendering his Indiana citizenship, he leaves Indiana with one set of rights and obligations and returns with another, simply because he traveled to another state with a different set of rules.

From the earliest days of this country, the right to travel freely among the states has been recognized as an essential right of national citizenship. *See* Articles of Confederation, art. IV, § 1 (1778) (recognizing a right of "free ingress and regress to and from any other State" and affording to the free inhabitants of each state "all privileges and immunities of free citizens in the several states"); U.S. Const., art. IV, § 2, cl. 1 ("[t]he citizens of each state shall be entitled to all Privileges and Immunities of Citizens in the several States"); *id.*, amend. XIV, § 1 ("All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law that shall abridge the privileges or immunities of citizens of the United States[.]"); *Corfield v. Coryell*, 6 Fed. Cas. 546, 552 (Cir. Ct. E.D. Pa. 1823) (Bushrod Washington, Circuit Justice) ("The right of a citizen of one

state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise … may be mentioned as [one] of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed to be fundamental … ."); *Passenger Cases*, 48 U.S. 283, 492 (1849) (Taney, C.J., dissenting) ("We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States."); *Edwards*, 314 U.S. at 178, 62 S. Ct. at 169 (Douglas, J., concurring) ("The right to move freely from State to State is an incident of national citizenship protected by the privileges and immunities clause of the Fourteenth Amendment against state interference."); *id.* at 183, 62 S. Ct. at 171 (Jackson, J., concurring) ("This Court should … hold squarely that it is a privilege of citizenship of the United States, protected from state abridgment, to enter any state of the Union, either for temporary sojourn or for the establishment of permanent residence therein and for gaining resultant citizenship thereof. If national citizenship means less than this, it means nothing."); *Shapiro*, 394 U.S. at 629, 89 S. Ct. at 1329 ("This Court long ago recognized that the nature of our Federal Union and our constitutional precepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden this movement.").

Traveling from one state to another at the cost of surrendering the rights one otherwise enjoys as the bona fide resident of one's home state is not free travel. Indiana cannot, I submit, tell one of its citizens, "You have all the rights of a Hoosier today, but if you travel to another state that accords

you lesser rights, you return with only so many rights as that state gave you." To do so may implicate the first as well as the third aspect of the right to travel, *see ante* at 11 (outlining the three aspects), but it certainly violates the central teaching of the Supreme Court's right-to-travel precedents, which is that a state cannot invidiously classify its residents, and afford them differential rights, based on when and whence they have come to the state.

9.

States can and do reach different conclusions about what crimes should require registration. They also can and do reach different conclusions about whether registration obligations are punitive, such that they implicate their own *ex post facto* provisions. What they cannot do, having settled these questions in a particular way, is to apply a different set of rules to a citizen who has relocated from a jurisdiction that answered the questions differently. In terms of his rights as a state citizen, an Indiana citizen newly relocated from Texas is not a former Texan, he is a Hoosier, period, and he must be treated as such.

Indiana decided to require registration for the particular offenses that the plaintiffs committed, but only after the plaintiffs committed those crimes. And because Indiana's Supreme Court has decided that the state's registration obligations are punitive, Indiana's *ex post facto* provision bars the state from requiring registration of all six plaintiffs based on their criminal histories. The state cannot pick and choose which of its residents can claim the benefit of that provision, but that is in effect what Indiana is doing. By placing its reliance on the fact that an offender relocated from another state that imposed a registration obligation as a matter of its own laws (including

its *ex post facto* jurisprudence) as the basis for requiring the offender to register in Indiana, it is precluding the offender from claiming the benefit of the Indiana *ex post facto* clause that another citizen of Indiana would be entitled to claim. It is saying to plaintiff Hope, "Yes, you had a right to be free from registration when you previously lived in Indiana and committed your offense, but you lost that right when you moved to Texas, which interpreted its own legal provisions so as to require you to register."

None of the six plaintiffs in this case has done a single thing to distinguish himself from a similarly-situated Indiana offender who, by virtue of the timing of his residency in Indiana, cannot be required to register under *Wallace*—except relocate (i.e., travel) from another state that had different registration rules. The right to travel, as conceived and applied by the Supreme Court, forbids such inconsistent and discriminatory treatment of Indiana's citizens. The express logic, if not the fact-specific holdings, of the Supreme Court's right-to-travel precedents, call upon us to affirm the district court's decision to grant the plaintiffs declaratory and injunctive relief on this point.

For the foregoing reasons, and the additional reasons set forth in the panel's now-vacated majority opinion, 984 F.3d 532, I respectfully dissent as to this aspect of the court's decision.