**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 23-2040**

———————

NATIONAL ASSOCIATION FOR RATIONAL SEXUAL OFFENSE LAWS; NC RSOL; JOHN DOE 1; JOHN DOE 2,

Plaintiffs − Appellants,

v.

ATTORNEY GENERAL JOSHUA STEIN; DISTRICT ATTORNEY LORRIN FREEMAN; DISTRICT ATTORNEY SEAN BOONE; DISTRICT ATTORNEY REECE SAUNDERS,

Defendants – Appellees.

———————

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Loretta C. Biggs, District Judge.  (1:17−cv−00053−LCB−JLW)

———————

Argued: May 9, 2024                                    Decided: August 9, 2024

———————

Before DIAZ, Chief Judge, and NIEMEYER and RICHARDSON, Circuit Judges.

———————

Affirmed by published opinion. Chief Judge Diaz wrote the opinion in which Judge Niemeyer and Judge Richardson joined.

———————

**ARGUED:**  Paul Moore Dubbeling, P.M. DUBBELING, PLLC, Chapel Hill, North Carolina, for Appellant.  Ryan Y. Park, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Joshua H. Stein, Attorney General, Lindsay Vance Smith, Deputy Solicitor General, Mary Elizabeth D. Reed, Solicitor General Fellow, Joseph Finarelli, Special Deputy Attorney General, Tamika L. Henderson, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF

JUSTICE, Raleigh, North Carolina, for Appellees.

2

DIAZ, Chief Judge:

Plaintiffs challenge the constitutionality of North Carolina's sex offender registration statute under the Ex Post Facto Clause of Article I, Section 10, Clause 1 of the Constitution, which prohibits the retroactive application of any new punishment for a crime committed in the past. In its current form, the law requires that qualifying offenders report certain information to their county sheriff, and limits where they can live, work, and visit.

After a bench trial, the district court found that the law was nonpunitive and thus consistent with the Ex Post Facto Clause. We agree and affirm the district court's judgment.

## I.

## A.

Like all other states and the federal government, North Carolina has enacted a sex offender registration statute that imposes various obligations and restrictions on people convicted of certain crimes. N.C. Gen. Stat. § 14-208.5 *et seq.* The statute requires that qualifying offenders provide (and regularly update) state law enforcement with certain information. It also restricts where registrants can work, live, and visit. Though we need not consider each individual aspect of this complex law, we highlight its contours and major restrictions.

The registration statute generally applies to all offenders who have been convicted of "an offense against a minor, a sexually violent offense," or who attempt to commit such

3

an offense. *Id.* §§ 14-208.6(4), 14-208.7.    On top of that, it applies to a handful of other specific offenses. *Id.* §§ 14-208.6(4)(d)–(f), 14-208.7.

The statute requires that qualifying offenders provide to their county sheriff certain personal information, including their name, address, date of birth, physical characteristics, and details of their conviction. *Id.* § 14-208.7(a)-(b).  Some of this information becomes available to the public. *See id.* § 14-208.10(a).  Law enforcement will also take registrants' photograph and fingerprints. *Id.* § 14-208.7(b)(3)–(4).  Certain changes to registrants' information must be reported, in person, to law enforcement. *Id.* § 14-208.9.  Registrants must also semiannually verify their information by returning a form, in person, within three business days of receiving it from the State. *Id.* § 14-208.9A(a).  And the county sheriff may, at any time, "attempt to verify" a registrant's address. *Id.* § 14-208.9A(b).

Beyond these information requirements, the statute broadly prohibits registrants from working in roles involving supervision of minors, *id.* § 14-208.17, as well as from a handful of specific roles that may involve interacting with minors, such as driving a school bus or commercial passenger vehicle, or working in emergency medical services, *see id.* §§  14-208.19A, 131E-159(h).

Registrants may not knowingly reside within 1,000 feet of a school or child care center. *Id.* § 14-208.16(a).  Most registrants can't knowingly visit any place "intended primarily" for the use or care of minors, such as schools or playgrounds, *id.* 14-208.18(a)(1), and some are restricted from being within 300 feet of any such place when

it's located within an area not intended for such use (e.g., malls), *id.* § 14-208.18(a)(2).[1]
And most can't visit any place that "minors frequently congregate" when minors are present, such as libraries, parks, and pools. *Id.* § 14-208.18(a)(3).

But these restrictions aren't without exception. Registrants may live within 1,000 feet of a school or child care center that opens after they have established residency. *Id.* § 14-208.16(d). If they have children, they may go on school property for meetings with school personnel in some cases. *Id.* § 14-208.18(d). And they can visit any place that might otherwise be prohibited in order to vote. *Id.* § 14-208.18(e).

The statute's requirements generally apply for thirty years, *id.* § 14-208.7(a), but offenders can petition to be removed from the registry after ten years, *id.* §§ 14-208.7(a), 14-208.12A(a). Those convicted of certain crimes, however, remain subject to the registration requirements for life unless their conviction is vacated or pardoned. *Id.* §§ 14-208.23, 14-208.6C.

The failure to comply with many of the statute's requirements is a felony. *E.g.*, *id.* §§ 14-208.11(a), 14-208.16(f), 14-208.17(c), 14-208.18(h).

## B.

Plaintiffs are two nonprofit corporations—the National Association for Rational Sex Offense Laws ("NARSOL") and North Carolinians for Rational Sex Offense Laws ("NC RSOL"). Both advocate for reform of sex offense registries on behalf of their

---

[1] The latter restriction doesn't apply to those whose offenses didn't involve a minor and who havn't otherwise been found by a court to be a danger to minors. *See id.* § 14-208(c)(2).

members, who are qualifying registrants.  Along with an individual registrant,[2] they filed suit against the North Carolina Attorney General and three District Attorneys under 42 U.S.C. § 1983, asserting a facial challenge to the constitutionality of North Carolina's sex offender registry statute.[3]  Because the statute has been amended over time, and some of the major restrictions apply retroactively, Plaintiffs assert that certain of these restrictions violate the Ex Post Facto Clause and seek to bar their retroactive application.[4]

## C.

The district court held a four-day bench trial during which Plaintiffs presented evidence about the recidivism rates of sex offenders, the difficulties they face in finding housing and employment, and the burdens that the law's restrictions impose on their lives.

---

[2] The individual registrant has since been removed from the registry, and the parties agree that his claim is moot.

[3] The parties dispute the standard that applies to facial challenges.  The State insists that Plaintiffs must show that "no set of circumstances exist under which the [statute] would be valid," Appellees' Br. at 17 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)), while Plaintiffs suggest that the question is merely whether the statute "passes the relevant constitutional test,"—here, the test articulated in *Smith*. Reply Br. at 7–8.  We need not reach this issue as Plaintiffs' claims fail even under the less demanding approach.

[4] The complaint seeks to bar retroactive application of a handful of specific amendments.  J.A. 39–40;  Appellees' Br. at 9–10 (describing amendments).  Because the parties' briefing discusses these amendments and the rest of the law collectively, we do the same.  But we express no view on whether amendments not challenged in the complaint may be applied retroactively.  And because they weren't presented in Plaintiffs' briefing to the district court, we decline to consider the handful of provisions Plaintiffs identify that were enacted after the filing of the complaint.  Appellants' Br. at 2 (collecting amendments).

6

After trial, the district court made findings of fact and conclusions of law. Applying the framework set out in *Smith v. Doe*, 538 U.S. 84 (2003), the district court first considered whether the legislature intended to enact a civil, nonpunitive scheme. *See* J.A. 113–15. Finding that it did, the court then addressed whether the effects of the statute were so punitive as to override the legislature's intent and render the scheme itself punitive. J.A. 115–31. Because Plaintiffs failed to show by the "clearest proof" that the effects were sufficiently punitive, the court concluded that retroactive application of the challenged amendments was consistent with the Ex Post Facto Clause. J.A. 131.

Plaintiffs appeal that order.

## II.

We review the district court's factual findings for clear error and conclusions of law de novo. *Harrell v. DeLuca*, 97 F.4th 180, 189 (4th Cir. 2024).

The Ex Post Facto Clause "forbids the application of any new punitive measure to a crime already consummated." *Kansas v. Hendricks*, 521 U.S. 346, 370 (1997) (quoting *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 505 (1995)). To determine whether a challenged law "impose[s] punishment," *id.*, the Supreme Court has developed a two-pronged inquiry, *see Smith*, 528 U.S. at 92.

First, we consider "whether the legislature meant the statute to establish 'civil' proceedings." *Id.* (quoting *Hendricks*, 521 U.S. at 361). If not, and the "intention of the legislature was to impose punishment, that ends the inquiry." *Id.* But if the legislature intended to "enact a regulatory scheme that is civil and nonpunitive," we proceed to the

7

second step. *Id.* There, we ask whether the statute is "so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Id.* (cleaned up) (quoting *Hendricks*, 521 U.S. at 361). But because we "ordinarily defer to the legislature's stated intent, only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* (cleaned up) (citations omitted).

A.

At *Smith*'s first step, we consider the legislature's intent as expressed in the text. "Whether a statutory scheme is civil or criminal 'is first of all a question of statutory construction.'" *Id.* (quoting *Hendricks*, 521 U.S. at 361). We examine "whether the legislature . . . indicated either expressly or impliedly" its intent, *Smith*, 538 U.S. at 93 (quoting *Hudson v. United States*, 522 U.S. 93, 99 (1997)), and afford "considerable deference" to the intent as stated, *id.* at 93.

The North Carolina legislature has made express that the purpose of its enactment is to protect public safety:

> Therefore, it is the purpose of this Article to assist law enforcement agencies' efforts to protect communities by requiring persons who are convicted of sex offenses or of certain other offenses committed against minors to register with law enforcement agencies, to require the exchange of relevant information about those offenders among law enforcement agencies, and to authorize the access to necessary and relevant information about those offenders to others as provided in this Article.

N.C. Gen. Stat. § 14-208.5. The same section makes various other references to the "protection of the public," "public safety and welfare," and "protect[ing] communities." *Id.* These express statements indicate that the legislature intended the registry to be a civil,

8

nonpunitive scheme. *See Smith*, 538 U.S. at 93 (finding that similar statutory provisions supported conclusion that Alaska registration statute was nonpunitive); *United States v. Under Seal*, 709 F.3d 257, 263–64 (4th Cir. 2013) (same for federal statute); *Doe v. Settle*, 24 F.4th 932, 946–47 (4th Cir. 2022) (same for Virginia statute).[5] We owe "considerable deference" to this stated intent. *Smith*, 538 U.S. at 92–93.

None of Plaintiffs' contrary arguments "shift our reading of the statutory purpose." *See Settle*, 24 F.4th at 947.

Plaintiffs contend that the public safety rationale isn't strong evidence of the legislature's intent given that public safety is the "general purpose behind all laws." Appellants' Br. at 22. But we and the Supreme Court have nevertheless found similar rationales to be indicative of nonpunitive intent. *Settle*, 24 F.4th at 946–47; *Smith*, 538 U.S. at 93.

And *Smith* tells us that's true despite the connection between public safety and criminal law. There, the Court credited the stated public safety rationale even though it was also "consistent with the purposes" of criminal law because "the State's pursuit of it in a regulatory scheme does not make the objective punitive." 538 U.S. at 94; *accord Under Seal*, 709 F.3d at 264 & n.3 (explaining that the statutory purpose of protecting the public supported a finding that the statute was not punitive despite the fact that such a goal

---

[5] *Settle* involved a claim that the Virginia registry violated the Eighth Amendment's prohibition on cruel and unusual punishments. 24 F.4th at 945. But we recognized that, in determining whether something amounts to "punishment" for purposes of the Eighth Amendment, *Smith*'s two-prong test applies. *Id.* at 945 n.11.

"might also be consistent with the purposes of criminal justice"); *Settle*, 24 F.4th at 946 (same).

So these cases teach that the breadth of the stated purpose is no reason to doubt the legislature's sincerity.

Nor do we agree with Plaintiffs' that the stated public safety purpose applies only to the statute as originally enacted and not its amendments. Appellants' Br. at 22. It's true that the statutory purpose section was enacted before many of the amendments that make the scheme what it is today. But by its terms, the provision announces the purposes of "this Article" and thus applies to the entire statute. N.C. Gen Stat. § 14-208.5. That the General Assembly amended the registry program without also amending Section 14-208.5 shows that it understood the amendments to be consistent with the already-stated purpose.

We credited an even more attenuated statutory purpose in *Settle*. There, we noted that Virginia's registration statute was originally codified within Virginia's criminal code and lacked a statutory purpose. *Settle*, 24 F.4th at 947. After *Smith* was decided, Virginia moved parts of the statute out of the criminal code and added a provision announcing that the purpose of the law was to protect the public. *See id.* at 946–47. Still, we refused to doubt the sincerity of the legislature's statement of the law's purpose. *Id.* at 947 (noting that although a "cynical mind might read this history as gamesmanship, . . . we read this as more evidence that Virginia has no punitive intent and simply wanted to be clear about it"). Thus, *Settle* offers another reason to presume that the North Carolina legislature meant what it said in announcing the law's purpose.

10

Nor do the statute's "[o]ther formal attributes" cast doubt on the legislature's stated purpose. *See Smith*, 538 U.S. at 94.

At the outset, we note that the registry's administration by law enforcement is irrelevant. That was true of the statutes in *Smith and Settle*. *See Smith,* 538 U.S. at 90; *Settle*, 24 F.4th at 947.

Nor are we moved by the fact that the registration statute is codified in North Carolina's criminal code. N.C. Gen. Stat. § 14-208.5 *et seq*. *Smith* acknowledged that although probative, the partial placement of the statute in the state's criminal code wasn't dispositive. *See* 538 U.S. at 94–95. And *Smith* relied on the fact that the state's criminal code "contain[ed] many provisions that do not involve criminal punishment," including "laws protecting the confidentiality of victims and witnesses" and "laws governing civil postconviction actions." *Id.* at 95.

Although the North Carolina statute is codified entirely within the state's criminal code, that code similarly contains several nonpunitive provisions. *E.g.*, N.C. Gen. Stat. § 14-43.18 (creating a civil cause of action for human trafficking victims); *id.* § 14-43.20(c) (authorizing funds and services for human trafficking victims); *id.* § 14-190.5A(g) (creating a civil cause of action for disclosure of private images). Thus, as in *Smith*, the inclusion of these nonpunitive provisions suggests that the placement of the registration statute in the criminal code doesn't necessarily render it punitive. *See Smith*, 538 U.S. at 94–95; *cf. McGuire v. Marshall*, 50 F.4th 986, 1006 (11th Cir. 2022) (per curiam) (finding full codification of a registry program in a state's criminal code insufficient to overcome the non-punitive statutory purpose).

11

Next, Plaintiffs emphasize that registration is a mandatory condition of probation and supervised release. Again, *Smith* controls. There, the Court considered the relevance of a provision in the state's criminal code requiring that, upon acceptance of a plea and entry of judgment, the judge inform criminal defendants of their obligation to register and include the requirements in the judgment. 538 U.S. at 95. But far from finding this indicative of punitive intent, the Court explained that it was merely an "effective" way to inform qualifying offenders of the "civil consequences of their criminal conduct." *Id.* at 95–96.

So too here. The registration statute requires that qualifying offenders register independently from the mandatory conditions imposed as part of their criminal judgments. N.C. Gen. Stat. § 14-208.7(a) ("A person who . . . has a reportable conviction shall be required to maintain registration with the sheriff . . . ."). That it's *also* included as a mandatory condition of release merely reflects the most efficient means of notifying qualifying offenders of their obligations. *Smith*, 538 U.S at 95–96.

Finally, as an "objective indica[tion]" that the statute isn't meant to be civil, Plaintiffs note that it doesn't always apply retroactively.[6] Appellants' Br. at 22–23. By this, Plaintiffs suggest that the legislature wasn't *really* focused on protecting the public

---

[6] Although many of the statute's amendments do apply retroactively (thus giving rise to this Ex Post Facto challenge), when the legislature has added new qualifying offenses, it has done so only prospectively. *E.g.*, Act of July 17, 2004, 2004 N.C. Sess. Laws 109 (expanding the definition of a qualifying "[r]eportable conviction" but applying the new definition only to offenses committed after a certain effective date).

12

because, if it were, it would have "reach[ed] back to register persons previously convicted" of newly qualifying offenses. *See id.* at 22 (cleaned up).

But that the statute could have gone even further is no reason to doubt the legislature's stated purpose. *Cf. Smith*, 538 U.S. at 103 ("A statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance."). That's because "[l]egislation is . . . the art of compromise," *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017), and no statute "pursues its stated purpose at all costs," *id.* (quoting *Rodrigues v. United States*, 480 U.S. 522, 526 (1987)). Indeed, there may be good policy reasons why the legislature has chosen not to apply the statute to offenders whose crimes were previously ineligible—the most obvious being that it may be difficult to track down and notify such offenders of their newfound obligations.

In sum, we take the legislature at its express word that it intended to create a civil, nonpunitive regime. So we must proceed to *Smith*'s second step.

## B.

Since we conclude that the legislature intended to create a civil, nonpunitive regime, Plaintiffs can prevail only by showing that the law's punitive effect is "so overwhelming that it negates the State's nonpunitive intentions." *Settle*, 24 F.4th at 946. Though neither "exhaustive nor dispositive," this inquiry generally asks whether the registration statute (1) has a rational connection to a nonpunitive purpose; (2) is excessive with respect to its purposes; (3) has been regarded in our history and traditions as punishment; (4) imposes an affirmative disability or restraint; and (5) promotes the traditional aims of punishment. *Smith*, 538 U.S. at 97 (quoting *United States v. Ward*, 448 U.S. 242, 249 (1980)). Despite

13

some overlap between them, we "consider each of these factors in turn and determine whether the sum provides the 'clearest proof' that the registry is punitive in effect." *Settle*, 24 F.4th at 948 (quoting *Smith*, 538 U.S. at 105).

1.

First, we consider whether the statute has a "rational connection to a nonpunitive purpose." *Smith*, 538 U.S. at 87. This is the "most significant factor" in our analysis, *id.* at 102 (cleaned up) (citation omitted), and it easily favors the State. "Public safety is a quintessentially legitimate justification," and sex offender registries are "no doubt connected to that goal." *Settle*, 24 F.4th at 948.

Resisting this conclusion, Plaintiffs suggest that the statute doesn't advance public safety, Appellants' Br. at 24–25, and may actually increase recidivism, *see* Reply Br. at 14–15. But the statute need not have a "close or perfect fit with the nonpunitive aims it seeks to advance." *Smith*, 538 U.S. at 103. In *Settle*, we acknowledged that some courts have suggested that registration statutes may increase recidivism, but noted that the public safety justification was nevertheless rational because the Virginia legislature "is free to disagree with that empirical prediction or pursue other goals like investigatory efficiency." 24 F.4th at 948. The same holds true here.

Plaintiffs also claim that the legislature didn't rely on any "objective evidence" that the statute would increase public safety. Appellants' Br. at 25. But even assuming that's true, it's irrelevant. States are free to legislate "based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993);

14

*see also Settle*, 24 F.4th at 948.  So the legislature need not have been motivated by specific evidence.

Thus, the registration statute is rationally connected to a nonpunitive purpose.  And "[b]ecause this factor favors [the State] and because it is the most important factor, this is strong evidence that the law is nonpunitive in effect."  *Settle*, 24 F.4th at 949.

2.

Next, we assess whether the statute is "excessive with respect to [its] purpose." *Smith*, 538 U.S. at 97.  This is "not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy."  *Id*. at 105. Rather, we ask only whether the legislature's choice was "reasonable in light of the nonpunitive objective."  *Id.*  This inquiry is "reminiscent of the rational basis test" addressed by the first factor.  *See Settle*, 24 F.4th at 949.

Plaintiffs contend that the statute is excessive with respect to its public safety purpose because its restrictions apply broadly to all offenders without regard for whether an individual offender is dangerous.

But registration statutes need not make individualized determinations of dangerousness.  *Smith* held that because the "Ex Post Facto Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences," the State may "legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness."  *See* 538 U.S. at 103–04 (emphasis omitted); *Settle*, 24 F.4th at 949 (applying *Smith*'s rationale and finding it "beside the point" that the plaintiff himself "may

15

not pose a danger"). Thus, that some offenders may not pose a danger doesn't render the statute excessive with respect to its public safety purpose.

Nor does the statute apply to an excessively broad category of offenses. Plaintiffs object that the statute captures those with "no felony record, who have not committed a sexual offense, who have no history of offenses against minors, and who were convicted for consensual sexual conduct." Appellants' Br. at 27; *see also id.* at 10. But despite this innocuous framing, the offenses Plaintiffs cite as evidence of the statute's overbreadth confirm its reasonableness.

As an example of a qualifying non-felony offense, Plaintiffs cite a law governing misdemeanor sexual battery, N.C. Gen. Stat. § 14-27.33. For non-sexual offenses, they cite laws criminalizing castration and maiming, *id.* § 14-29, abduction of a minor, *id.* § 14-41, and restraining a person without consent, *id.* § 14-43.3. For offenses not involving minors, Plaintiffs point to laws prohibiting forcible sexual conduct, *id.* § 14-27.26, and sexual conduct with a person with a mental disability, *id.* § 14-27.27(a)(2). And for "consensual sexual conduct," they cite laws criminalizing statutory rape, *id.* §§ 14-27.24–.25, and incest, *id.* § 14-178. But given the seriousness of these offenses, we think their inclusion in the registration statute is plainly reasonable considering the law's public safety purpose.

To be sure, we held in *Doe v. Cooper* that an earlier iteration of one of the registry's location restrictions was unconstitutional because it applied broadly to all qualifying offenders and not just those who were dangerous to minors. *See* 842 F.3d 833, 845–47 (4th Cir. 2016). But *Cooper* involved an overbreadth challenge under the First

16

Amendment, which requires that a content-neutral statute burdening First Amendment activities pass intermediate scrutiny. *Id.* at 845–46. That is, the State was required to prove that the statute "materially advance[s] an important or substantial government interest" and doesn't "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* at 846 (cleaned up) (citations omitted). In an Ex Post Facto challenge, by contrast, the law need only be *reasonable* in light of the nonpunitive objective. *Settle*, 24 F.4th at 949.

Because the registration statute easily satisfies that lower bar, we find that it isn't excessive with respect to its public safety purpose.

3.

Next, we ask whether the statute has been "regarded in our history and traditions as punishment." *Smith*, 538 U.S. at 97. In doing so, we "compar[e] the registration [statute] to historical punishments to consider whether the effects are the same." *Settle*, 24 F.4th at 949 (citing *Smith*, 538 U.S. at 97–99).

Plaintiffs primarily contend that we need not engage in this inquiry because the registration requirement "*is* punishment," as it is a mandatory condition of probation and supervised release. Appellants' Br. at 31. But as we've discussed, *supra* Part II.A, *Smith* involved a similar arrangement in which the registry requirements were set forth in the criminal judgment. 538 U.S. at 95. The Court addressed this requirement in the first step of the analysis—whether the legislature intended to create a civil scheme—and concluded that the requirement was merely an effective way to inform offenders of the "civil consequences of their criminal conduct." 538 U.S. at 95–96. And in the second step, it

17

then analyzed whether the scheme resembled historical punishments. *Id.* at 97–98. Because the Court didn't simply characterize this arrangement as punitive without analyzing comparable historical punishments, neither will we.

Proceeding to that inquiry, we consider whether the statute is sufficiently like the types of historical punishments Plaintiffs invoke—supervised release and banishment. We conclude that neither are a compelling fit.

i.

First, consider supervised release. *Smith* acknowledged its parallel to the registration requirement, but ultimately found it too dissimilar. *Smith*, 538 U.S. at 101–02. It explained that supervised release "entail[s] a series of mandatory conditions and allow[s] the supervising officer to seek the revocation of . . . release in case of infraction." *Id.* at 101. But it rejected supervised release as a historical analogue to the registry, as registrants were "free to move where they wish and to live and work as other citizens, with no supervision," and need not "seek permission" before making changes that they would have to report. *Id.* at 101–02. Though the former isn't true here, given the residency and work restrictions, the latter is. Although registrants must report changes to their information, they need not seek advanced permission.

Certainly, the registration requirement involves greater supervision than in *Smith*. Registrants must register their information, N.C. Gen Stat. § 14-208.7, verify it semiannually, *id.* § 14-208.9A(a), and provide updates for certain changes, *id.* § 14-208.9. And they often undergo unplanned "compliance checks" from law enforcement. J.A. 79–80; *see also* § 14-208.9A(b) (authorizing the sheriff to "attempt to verify that the offender

18

continues to reside at the address last registered"). But *Settle* rejected treating similar information-gathering activities as sufficiently analogous to historic punishments involving supervision. *See Settle*, 24 F.4th at 951 ("Historically, a probation officer took a far more active role in a probationer's life than simply collecting information for a database." (quoting *Shaw v. Patton*, 823 F.3d 556, 564 (10th Cir. 2016). As in *Settle,* any parallel to supervised release doesn't move the needle.

ii.

Second, Plaintiffs contend that the restrictions on where they can live, work, and visit are like the historical punishment of banishment. As did the Supreme Court in *Smith* and this court in *Settle*, we disagree.

*Smith* described the historical punishment of banishment as "expel[ing] [the offender] from the community." 538 U.S. at 98. And *Settle* described it as rendering offenders "dead in the law and entirely cut off from society." 24 F.4th at 951 (cleaned up) (quoting 1 William Blackstone, Commentaries *132). Although the restrictions at issue here are severe, their effects aren't akin to banishment.

To begin, registrants may still live in much of North Carolina. Plaintiffs presented evidence that 49% of housing in Charlotte, 48.3% in Raleigh, and 42.8% in Greensboro would be off-limits as options to registrants. But this leaves over half of each of these metropolitan areas available, demonstrating that the registrants aren't at all "expelled" from

19

the community.[7] *See McGuire*, 50 F.4th at 1010 (rejecting comparison to banishment even though 80% of housing was off-limits to registrants). Moreover, the district court's finding that only 411 out of the State's 25,063 registrants are homeless, J.A. 120, shows that registrants have managed to find some housing despite these restrictions.

That the residency restriction has exceptions also undermines any comparison to banishment. Although registrants generally may not live within 1,000 feet of a school or childcare center, they may do so if the facility opens after the registrant establishes residency nearby. N.C. Gen. Stat. § 14-208.16(d). Because registrants are not even completely prohibited from living in proximity to schools and childcare centers, the law doesn't come close to expelling them from the community. *Cf. Nelson v. Town of Paris*, 78 F.4th 389, 397–98 (7th Cir. 2023) (finding that 6,500-foot residency restriction didn't amount to banishment in part because it included a similar exception).

4.

Next, we consider whether the statute imposes an "affirmative disability or restraint." *Smith*, 538 U.S. at 97. We look to "how the effects of the [registry statute] are felt by those subject to it." *Id.* at 99–100. "If the disability or restraint is minor and indirect, its effects are unlikely to be punitive." *Id.* at 100.

Analyzing this factor in *Settle*, we relied heavily on the fact that the scheme's restrictions didn't "approach the level of restraint imposed by a prison sentence"—the

---

[7] Though Plaintiffs now say that the statute's other restrictions exclude additional housing, Appellants' Br. at 15, 16, they bore the burden of proof at trial and failed to submit other evidence painting a more comprehensive picture of the housing market.

"paradigmatic example of an affirmative restraint." 24 F.4th at 952 (quoting *Smith*, 538 U.S. at 100. Instead, we characterized the scheme's restrictions as, "at worst, . . . minor and indirect." *Id.* (quoting *Smith*, 538 U.S. at 100).

Although the restrictions imposed by this scheme are less severe than imprisonment, we think the restrictions may be more than "minor and indirect"—especially given *Smith*'s command to consider "how the effects of the [registry statute] are felt by those subject to it," 538 U.S. at 99–100.

The district court highlighted the testimony of several registrants on this point. One registrant recounted that he couldn't visit (or was told to leave) a public park, a grocery store, a McDonalds, and a government building, either because children were present or because there was a playground on the premises. Others were restricted from attending churches and political rallies or enrolling in community college programs. Still others couldn't attend their children's activities, such as school concerts, graduations, and sporting events. And several testified about their difficulties in finding housing and employment.

Although the restrictions hardly equate to imprisonment, they impose serious burdens on registrants' everyday life. So we'll assume, without deciding, that this amounts to an "affirmative disability or restraint" and thus weighs in Plaintiffs' favor.[8]

---

[8] *Settle* doesn't demand otherwise, as it was decided on a motion to dismiss without a similarly developed factual record. 24 F.4th at 938–39. Moreover, although Virginia imposed work, residence, and location restrictions on sex offenders, Va. Code Ann. §§ 18.2-370.2–18.2-370.5, *Settle* considered some of these restrictions to be distinct from the registry program, 24 F.4th at 937 (noting that some restrictions were "tied to the (Continued)

5.

Next, we consider whether the registration statute promotes the traditional aims of punishment—"mainly retribution and deterrence." *Settle*, 24 F.4th at 952.

North Carolina does little to dispute the obvious: that the registry promotes both goals to some extent. So we think this factor too favors the Plaintiffs.

Courts though tend to give this factor very little weight. We've recognized that "*Smith* did not find it sufficient to simply state how the law might further the goals of retribution and deterrence." *Settle*, 24 F.4th at 952. Instead, *Smith* acknowledged that "[a]ny number of governmental programs might deter crime without imposing punishment." 538 U.S. at 102. And it rejected arguments that aspects of the law were retributive because they were nevertheless "reasonably related" to the law's regulatory objectives. *Id.* So too in *Settle*, we gave this factor little weight because the "wisps of deterrence and retribution" weren't "enough to show punitive intent." 24 F.4th at 952.

Thus, although the registration statute no doubt serves the purposes of punishment, that's not a compelling reason to find the scheme punitive. *Cf. Nelson*, 78 F.4th at 399 ("[W]hether sex offender residency restrictions promote the traditional aims of punishment

---

conviction and not the registry"). In any event, North Carolina's restrictions are more severe. For example, while North Carolina prohibits registrants from residing within 1,000 feet of a school, N.C. Gen. Stat. § 14-208.16(a), Virginia's prohibition is only 500 feet, Va. Code Ann. § 18.2-370.3(A). And while North Carolina broadly restricts registrants from even visiting locations "intended primarily" for children or "where minors frequently congregate," N.C. Gen. Stat. § 14-208.18(a), Virginia only prohibits being within 100 feet of such places "for the purpose of having contact" with children or otherwise "loitering" there, Va. Code Ann. § 18.2-370.2. Given these differences, *Settle* doesn't bind our analysis of this factor.

22

provides little value to the over-all *Smith* inquiry . . . because all such regulations inevitably overlap with the traditional aims of punishment . . . .").

6.

Finally, Plaintiffs urge us to "consider the extent to which the registry scheme burdens First Amendment and other fundamental liberties." Appellants' Br. at 33. Though we may ordinarily do so, as the *Smith* factors are "neither exhaustive nor dispositive," *Smith*, 538 U.S. at 97 (quoting *Ward*, 448 U.S. at 249), Plaintiffs have forfeited this argument by failing to develop it in their brief. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (explaining that an argument not developed in a party's opening brief is forfeited "even if its brief takes a passing shot at the issue" (cleaned up)). Although we can glean from Plaintiffs' brief their view that restrictions limiting their access to churches, political rallies, and school events burden certain First Amendment and parental rights, they offer no analysis of these claims.

But forfeiture aside, we fail to see how the violation of other constitutional rights bears on whether the registration statute is punitive under the Ex Post Facto Clause. Punishments must, of course, comply with constitutional limits. Just as a criminal sentence of torture would be unconstitutional, *Wilkerson v. Utah*, 99 U.S. 130, 136 (1878), so too would a sentence stripping an offender of all free exercise rights, *cf. Bell v. Wolfish*, 441 U.S. 520, 545 (1979) (noting that people convicted of crimes "do not forfeit all constitutional protections by reason of their conviction and confinement in prison"). And nonpunitive laws and practices too must comply with the Constitution. *E.g.*, *Trinity Lutheran Church of Columbia, Inc v. Comer*, 582 U.S. 449, 453, 466 (2017) (finding

23

unconstitutional a policy of denying grants for playground resurfacing to churches just because of their religious character).    In other words, because both punitive and nonpunitive laws must abide by other constitutional limits, whether the registration statute violates other constitutional rights doesn't inform our analysis under the Ex Post Facto clause.[9]

7.

Having considered each of the factors individually, we must now balance them to determine "whether the sum provides the 'clearest proof' that the registry is punitive in effect." *Settle*, 24 F.4th at 948 (quoting *Smith*, 538 U.S. at 105).    Though the registration statute imposes difficult burdens on qualifying offenders, and furthers the goals of punishment to some extent, the remaining factors—including the "most important" one— all favor the State.

On balance, we can't say that the record evidence shows by the "clearest proof" that the statute is so excessive that it negates the legislature's plainly nonpunitive intent. Accordingly, the district court's judgment is

*AFFIRMED.*

---

[9] We express no view as to Plaintiffs' suggestion that the statute violates other constitutional rights.    Because Plaintiffs haven't asserted those claims independently here, Reply Br. at 20, their resolution must await an appropriate case.

24